994 So.2d 1072 (2008)
Wayne TOMPKINS, Appellant,
v.
STATE of Florida, Appellee.
Wayne Tompkins, Appellant,
v.
State of Florida, Appellee.
Wayne Tompkins, Petitioner,
v.
State of Florida, Respondent.
Nos. SC08-992, SC08-1979, SC08-2000.
Supreme Court of Florida.
November 7, 2008.
*1075 Neal Dupree, Capital Collateral Regional Counsel, Fort Lauderdale, FL, and Martin J. McClain, Special Assistant CCR Counsel, Southern Region, Wilton Manors, FL, for Appellant/Appellant/Petitioner.
Bill McCollum, Attorney General, Tallahassee, FL, and Scott A. Browne, Assistant *1076 Attorney General, Tampa, FL, for Appellee/Appellee/Respondent.
PER CURIAM.
Tompkins, a prisoner under sentence of death and under an active death warrant, appeals from the trial court's orders denying motions to vacate his sentence under Florida Rule of Criminal Procedure 3.851.[1] Tompkins also petitions to invoke this Court's authority to issue all writs necessary to complete the exercise of its jurisdiction, or alternatively to issue a writ of habeas corpus, or both. Because the orders concern postconviction relief from a sentence of death, this Court has jurisdiction of the appeal under article V, section 3(b)(1), Florida Constitution. Additionally, we have jurisdiction over the petition under article V, sections 3(b)(7) and 3(b)(9), Florida Constitution. For the reasons stated in this opinion, we affirm the trial court's orders and deny Tompkins's petition for all writs and habeas relief.

FACTS AND PROCEDURAL HISTORY
In 1985, Wayne Tompkins was convicted of the 1983 first-degree murder of fifteen-year-old Lisa DeCarr and was sentenced to death on the recommendation of a unanimous jury. This case has a long procedural history. The conviction and death sentence have been reviewed and affirmed on direct appeal and have been the subject of multiple postconviction proceedings, including five postconviction motions, all of which have resulted in a total of eight opinions issued by this Court and federal courts.[2] The facts of this case are set forth in this Court's opinion in Tompkins's direct appeal of his conviction and sentence:
The victim, Lisa DeCarr, aged 15, disappeared from her home in Tampa on March 24, 1983. In June 1984, the victim's skeletal remains were found in a shallow grave under the house along with her pink bathrobe and jewelry. Based upon a ligature (apparently the sash of her bathrobe) that was found tied tightly around her neck bones, the medical examiner determined that Lisa had been strangled to death. In September 1984, Wayne Tompkins, the victim's mother's boyfriend, was charged with the murder.
At trial, the state's three key witnesses testified as follows. Barbara DeCarr, the victim's mother, testified that she left the house on the morning of March 24, 1983, at approximately 9 a.m., leaving Lisa alone in the house. Lisa was dressed in her pink bathrobe. Barbara met Wayne Tompkins at his mother's house a few blocks away. Some *1077 time that morning, she sent Tompkins back to her house to get some newspapers for packing. When Tompkins returned, he told Barbara that Lisa was watching television in her robe. Tompkins then left his mother's house again, and Barbara did not see or speak to him again until approximately 3 o'clock that afternoon. At that time, Tompkins told Barbara that Lisa had run away. He said the last time he saw Lisa, she was going to the store and was wearing jeans and a blouse. Barbara returned to the Osborne Street house where she found Lisa's pocketbook and robe missing but not the clothes described by Tompkins. Barbara then called the police.
The state's next witness, Kathy Stevens, a close friend of the victim, testified that she had gone to Lisa DeCarr's house at approximately 9 a.m. on the morning of March 24, 1983. After hearing a loud crash, Stevens opened the front door and saw Lisa on the couch struggling and hitting Tompkins who was on top of her attempting to remove her clothing. Lisa asked her to call the police. At that point, Stevens left the house but did not call the police. When Stevens returned later to retrieve her purse, Tompkins answered the door and told her that Lisa had left with her mother. Stevens also testified that Tompkins had made sexual advances towards Lisa on two prior occasions.
Kenneth Turco, the final key state's witness, testified that Tompkins confided details of the murder to him while they were cellmates in June 1985. Turco testified that Tompkins told him that Lisa was on the sofa when he returned to the house to get some newspapers for packing. When Tompkins tried to force himself on her, Lisa kicked him in the groin. Tompkins then strangled her and buried her under the house along with her pocketbook and some clothing (jeans and a top) to make it appear as if she had run away.
After the state rested its case, the trial court denied Tompkins' motion for acquittal, finding that the evidence was sufficient to prove premeditation and that the state had established a prima facie case. The defense rested after the close of the state's case without presenting any additional evidence. The jury found Tompkins guilty as charged.
At the penalty phase, the state presented evidence from three witnesses to show that Tompkins had been convicted of kidnapping and rape stemming from two separate incidents in Pasco County which occurred after Lisa DeCarr's disappearance. The defense presented testimony from three witnesses regarding Tompkins' good work record, shy and nonviolent personality, and honesty.
The trial judge, finding three aggravating circumstances (previous conviction of felonies involving the use or threat of violence to the person; murder committed while the defendant was engaged in an attempt to commit sexual battery; murder was especially heinous, atrocious, or cruel) and one statutory mitigating circumstance (defendant's age at the time of the crime), followed the jury's recommendation and sentenced Tompkins to death.
Tompkins I, 502 So.2d at 417-18 (footnotes omitted).
The complex procedural history of this case is detailed in our most recent opinion, and we therefore do not repeat it in this opinion. See Tompkins VI, 980 So.2d at 452-56. In Tompkins VI, we reviewed the trial court's denial of Tompkins's third postconviction motion, in which he alleged that new information provided by James Davis, Lisa DeCarr's boyfriend at the time of her disappearance, significantly impeached the testimony of Kathy Stevens *1078 and required reversal of the conviction and death sentence. 980 So.2d at 455.[3] Specifically, Davis stated that he did not see Stevens at the corner store on the morning Stevens witnessed Tompkins assaulting Lisa, contrary to Stevens's testimony. Tompkins VI, 980 So.2d at 455. The trial court evaluated Tompkins's claim as one of newly discovered evidence and denied the claim. Id. at 456.
This Court affirmed the trial court's denial of the claim. This Court concluded that although the impeachment evidence could not be viewed as insignificant, when considered with the other evidence presented at trial, it was not of such nature that it would probably produce an acquittal on retrial. Id. at 458 (citing Jones v. State, 591 So.2d 911, 915 (Fla. 1991)). This Court engaged in an extensive analysis to reach this conclusion:
In this case, Davis's affidavit contradicts Stevens' testimony regarding her encounter with Davis at the corner store, which Stevens indicated was part of the reason she did not call the police. However, his statements do not address Stevens' testimony that she saw Tompkins attacking Lisa.
Further, Stevens, who was fifteen when she witnessed the assault and seventeen at the time of trial, was significantly impeached by defense counsel. She waited almost a year to come forward after Lisa's body was discovered and made previous statements to the prosecutor and Mrs. DeCarr that she had no information about Lisa's disappearance. The State's argument to the jury regarding Stevens' credibility in the face of this impeachment was that Stevens had no reason to lie. The statements in Davis's affidavit do not provide any new information that suggests that Stevens did, in fact, have a motive to lie.
. . . .
This is also not a case where an important witness has recanted his or her testimony. See Lightbourne v. State, 742 So.2d 238, 249 (Fla.1999) (remanding for an evidentiary hearing to determine whether newly recanted testimony, when considered cumulatively with all of the post-trial evidence indicated that other witnesses testified falsely, required a new penalty-phase hearing). Indeed, none of the State's three "key witnesses"  Mrs. DeCarr, Stevens, or Turco  has recanted.
. . . .
Finally, even when Davis's affidavit is considered cumulatively with any favorable evidence the State withheld, as alleged in Tompkins' prior two postconviction motions, we conclude that the motions, files, and records show that Tompkins is not entitled to relief under either the materiality prong of Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] or the second prong of Jones. In Tompkins IV, we affirmed the summary denial of Tompkins' Brady claims, concluding that "[e]ither the undisclosed documents are not Brady material because they are neither favorable to Tompkins nor suppressed, or Tompkins has not demonstrated that he was prejudiced by the lack of disclosure." 872 So.2d at 241. *1079 We further stated that "even if we were to engage in a cumulative analysis and consider the undisclosed, favorable documents in conjunction with Tompkins' claims raised in his first motion for postconviction relief, our conclusion as to prejudice would not change." Id. at 241-42. We reach the same conclusion in this case.
Tompkins VI, 980 So.2d at 458-59 (citation and footnote omitted).
On December 21, 2007, Tompkins filed a fourth successive amended or revised motion to vacate judgment and sentence, raising two claims: (1) the existing procedure that the State of Florida uses for lethal injection violates the Eighth Amendment to the United States Constitution because it constitutes cruel and unusual punishment; and (2) newly available information, specifically the ABA report, Evaluating Fairness and Accuracy in the State Death Penalty System: The Florida Death Penalty Assessment Report, issued in September 2006, demonstrates that Tompkins's conviction and sentence of death constitute cruel and unusual punishment in violation of the Eighth and Fourteenth amendments. The State filed a response. The trial court held a case management conference on February 21, 2008, at which the trial court informed the parties that it determined an evidentiary hearing was not necessary based on the nature of Tompkins's claims. On March 17, 2008, the trial court issued an order summarily denying Tompkins's motion. Tompkins filed a notice of appeal in this Court dated May 29, 2008.
On October 15, 2008, Tompkins filed a fifth successive amended or revised motion to vacate judgment and sentence raising six claims: (1) deprivation of due process rights under chapter 119, Florida Statutes, to access public records; (2) the Governor's failure to comply with section 922.06(2), Florida Statutes (2004), and reset Tompkins's execution in 2004 following the expiration of a stay precludes his execution; (3) the failure to reschedule Tompkins's execution four years ago violates the Eighth Amendment prohibition against cruel and unusual punishment; (4) newly discovered evidence, in the form of an affidavit from Kimberly Quillin (formerly Kim Lisenby) that contradicts Stevens's testimony, demonstrates that Tompkins is innocent and his conviction and sentence violate the Eighth Amendment; (5) collateral counsel was ineffective for failing to obtain a legible copy of a police report; and (6) Tompkins's conviction and sentence are unconstitutional because the evidence demonstrates he is not guilty.[4] The State filed a response. On October 21, 2008, the trial court issued an order summarily denying Tompkins's motion. Tompkins filed a notice of appeal in this Court dated October 22, 2008.
On October 24, 2008, Tompkins filed his petition for all writs jurisdiction, or alternatively for writ of habeas corpus in this Court, raising the following claims, all of which have been raised in either his fourth or fifth successive postconviction motion: (1) the Governor's failure to comply with section 922.06(2) and reset Tompkins's execution *1080 in 2004, following the expiration of a stay, precludes his execution; (2) failure to reschedule Tompkins's execution four years ago violates the Eighth Amendment; (3) collateral counsel was ineffective in failing to obtain a legible copy of the police report; (4) Tompkins's conviction and sentence are unconstitutional because the evidence demonstrates he is not guilty; and (5) lethal injection violates the Eighth Amendment.
We now consider both appeals as well as the petition for all writs and habeas relief.

ANALYSIS

Lethal Injection
We first address and reject Tompkins's claim that he was deprived of his due process rights of notice, opportunity to be heard, and presentation of evidence on his challenge to Florida's lethal injection procedures. Although Tompkins acknowledges that these issues were litigated in the emergency all writs petition filed in Lightbourne v. McCollum, 969 So.2d 326 (Fla.2007), cert. denied, ___ U.S. ___, 128 S.Ct. 2485, 171 L.Ed.2d 777 (2008), he claims that the trial court erred in denying him the opportunity to present his own witnesses in support of his challenge to the procedures.[5] Specifically, Tompkins sought to present the following evidence to the trial court that he claimed was not presented in Lightbourne: (1) testimony from Sara Dyehouse concerning the memorandum she wrote in 2006 on the revisions to the lethal injection protocol; (2) testimony from DOC Secretary McDonough regarding the Dyehouse memorandum; (3) testimony from Gretl Plessinger concerning the Dyehouse memorandum; and (4) testimony from Dr. David Varlotta, an anesthesiologist who was a member of the Governor's Commission on Administration of Lethal Injection ("the Commission") that was created after the Diaz execution to investigate and make recommendations to the Governor.
Florida Rule of Criminal Procedure 3.851 governs the filing of postconviction motions in capital cases. Rule 3.851(d)(1) generally prohibits the filing of a postconviction motion more than one year after the judgment and sentence become final. An exception permits filing beyond this deadline if the movant alleges that "the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence." Fla. R.Crim. P. 3.851(d)(2)(A). As the State acknowledges, Tompkins's challenge to the lethal injection protocol satisfies the rule 3.851(d)(2) exception because it was based on the allegedly botched December 13, 2006, execution of Angel Diaz. Rule 3.851 also provides certain pleading requirements for initial and successive postconviction motions. Fla. R.Crim. P. 3.851(e)(1)-(2). For example, the motion must state the nature of the relief sought, Fla. R.Crim. P. 3.851(e)(1)(C), and must include "a detailed allegation of the factual basis for any claim for which an evidentiary hearing is sought." Fla. R.Crim. P. 3.851(e)(1)(D).
Rule 3.851(f)(5)(B) permits the denial of a successive postconviction motion without an evidentiary hearing "[i]f the motion, files, and records in the case conclusively show that the movant is entitled *1081 to no relief." A postconviction court's decision regarding whether to grant a rule 3.851 evidentiary hearing depends on the written materials before the court; therefore, for all intents and purposes, its ruling constitutes a pure question of law and is subject to de novo review. See, e.g., Rose v. State, 985 So.2d 500, 505 (Fla.2008). In reviewing a trial court's summary denial of postconviction relief, this Court must accept the defendant's allegations as true to the extent that they are not conclusively refuted by the record. See Rolling v. State, 944 So.2d 176, 179 (Fla.2006).
Although Tompkins's fourth successive postconviction motion met the pleading requirements of rule 3.851, we conclude that the trial court did not err in summarily denying his lethal injection claims. This Court has repeatedly rejected appeals from summary denials of Eighth Amendment[6] challenges to Florida's August 2007 lethal injection protocol since the issuance of Lightbourne. See Power v. State, 992 So.2d 218, 220-21 (Fla.2008); Sexton v. State, 33 Fla. L. Weekly S686, S691, ___ So.2d ___, ___, 2008 WL 4240155 (Fla. Sept. 18, 2008); Henyard v. State, 992 So.2d 120, 129 (Fla.2008), cert. denied, ___ U.S. ___, 129 S.Ct. 28, 171 L.Ed.2d 930 (2008); Schwab v. State, 33 Fla. L. Weekly S431, S431-34, ___ So.2d ___, ___, 2008 WL 2553999 (Fla. June 27, 2008), petition for cert. filed, No. 08-5020 (U.S. June 30, 2008); Woodel v. State, 985 So.2d 524, 533-34 (Fla.2008), petition for cert. filed, No. 08-6527 (U.S. Sept. 24, 2008); Lebron v. State, 982 So.2d 649, 666 (Fla.2008); Schwab v. State, 982 So.2d 1158, 1159-60 (Fla.2008); Lightbourne, 969 So.2d at 350-53.[7] As this Court stated in Schwab v. State, 969 So.2d 318 (Fla.2007), "Given the record in Lightbourne and our extensive analysis in our opinion in Lightbourne v. McCollum, we reject the conclusion that lethal injection as applied in Florida is unconstitutional." Id. at 325. Moreover, there have been two developments since we issued our opinion in Lightbourne that support our conclusion that Florida's lethal injection protocol does not constitute cruel and unusual punishment under the Eighth Amendment. The first development was the decision of the Supreme Court of the United States in Baze v. Rees, ___ U.S. ___, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), finding this same method of execution, consisting of lethal injection through the same three-drug combination under similar protocols, to be constitutional. Moreover, we have rejected contentions that Baze set a different or higher standard for lethal injection claims than Lightbourne. See, e.g., Henyard, 992 So.2d at 129 (rejecting Henyard's argument that Baze sheds new light on this Court's decisions because the standard for reviewing Eighth Amendment challenges was changed and noting that "[w]e have previously concluded in Lightbourne and Schwab that the Florida protocols do not violate any of the possible standards, and that holding cannot conflict with the narrow holding in Baze"). The second development was the performance of two executions in Florida, those of Mark Dean Schwab and Richard Henyard, with no subsequent allegations of any newly discovered problems with Florida's lethal injection process, such as the problems giving *1082 rise to the investigations following the Diaz execution.
Further, the trial court did not err in not allowing Tompkins to present additional witnesses because the proposed testimony of these witnesses does not support a departure from this Court's precedent, since it has already been considered by this Court. The Dyehouse memorandum was addressed by this Court in Lightbourne:
With regard to the Dyehouse memorandum recommending the use of a BIS monitor to more accurately assess the level of consciousness of the inmate, it might be beneficial to incorporate a device that could monitor the inmate's level of sedation to ensure the inmate will not experience subsequent pain of execution. However, the Court's role regarding the executive branch in carrying out executions is limited to determining whether the current procedures violate the constitutional protections provided for in the Eighth Amendment.
969 So.2d at 352. Further, as Tompkins admits, Plessinger already testified in the Lightbourne evidentiary hearing and her testimony was before this Court in Lightbourne. Finally, in our previous decisions, we fully considered the report and recommendations of the Commission, of which Dr. Varlotta was a member, and the implementation of the report and recommendations by the DOC. See Schwab, 969 So.2d at 324; Lightbourne, 969 So.2d at 329-30. Based on the foregoing, we conclude that the trial court did not err in summarily denying relief on this claim.[8]

ABA Report
Tompkins next raises a claim of newly discovered evidence based on the ABA report issued on September 17, 2006, which he alleges identifies numerous defects and flaws in Florida's capital sentencing scheme that inject arbitrariness into the decision-making process. We conclude that the trial court did not err in summarily denying this claim, as this Court has repeatedly rejected the claim that the ABA Report in question is newly discovered evidence. This Court most recently addressed this issue in Power v. State, 992 So.2d 218 (Fla.2008):
Finally, Power argued at the circuit court that the ABA report entitled Evaluating Fairness and Accuracy in the State Death Penalty System: The Florida Death Penalty Assessment Report, published September 17, 2006, constitutes newly discovered evidence proving that imposition of the death penalty is cruel and unusual punishment in violation of the Eighth Amendment. Power correctly and candidly acknowledges that we rejected this argument in Rolling and Rutherford [v. State, 940 So.2d 1112 (Fla.2006) ]. In both cases, we concluded that this very same ABA report did not constitute newly discovered evidence and that "nothing in the report would cause this Court to recede from its past decisions upholding the facial constitutionality of the death penalty." *1083 Rolling, 944 So.2d at 181 (citing Rutherford, 940 So.2d at 1118). Furthermore, as in Rolling and Rutherford, Power has "not allege[d] how any of the conclusions in the report would render his individual death sentence unconstitutional." Rolling, 944 So.2d at 181; see also Rutherford, 940 So.2d at 1118. For these same reasons, we affirm the circuit court's summary denial of Power's claim.
Power, 992 So.2d at 222-23.
Tompkins attempts to differentiate his case from Power, Rolling, and Rutherford by arguing that he can demonstrate that his death sentence was imposed on an arbitrary basis. He contends that when this Court reversed the trial court's order granting a new penalty phase in Tompkins IV,[9] it acted arbitrarily in requiring him to "show something that had not been required in the prior cases[10]  [he] was required to `demonstrate[ ] that he was denied a neutral, detached judge or that Judge Coe failed to independently weigh the aggravating and mitigating circumstances at the time the sentencing order was prepared.'" Tompkins's claim fails for two reasons. First, this is merely an attempt to relitigate the issue of whether or not Tompkins was denied a fair sentencing proceeding as a result of the ex parte communication between the sentencing judge and the prosecutor. This claim was already decided adversely to Tompkins in Tompkins IV. See 872 So.2d at 244-45. In Diaz v. State, 945 So.2d 1136 (Fla.), cert. denied, ___ U.S. ___, 127 S.Ct. 850, 166 L.Ed.2d 679 (2006), this Court rejected a similar attempt to relitigate prior claims under the ABA Report:
Unlike Rutherford, Diaz did allege that many of the failures of the Florida death penalty system cited in the ABA Report were applicable in his case. However, this does not change the conclusion that the report is not newly discovered evidence. Furthermore, the "failures" that Diaz cites as applying to his case either have been or could have been litigated by him in his direct appeal and postconviction proceedings. Thus, we affirm the circuit court's summary denial of this claim.
Id. at 1146.
The second reason this claim fails is that Tompkins IV is distinguishable from Roberts, Riechmann, and Card. In Roberts, Riechmann, and Card, this Court determined that the sentencing judge failed to conduct an independent review of the aggravating and mitigating factors by engaging in ex parte communications with the State and adopting the State's sentencing order. See Roberts, 840 So.2d at 972-73 & n. 4; Riechmann, 777 So.2d at 351; Card, 652 So.2d at 345-46. In contrast, in Tompkins IV, this Court concluded, "Tompkins has not demonstrated that he was denied a neutral, detached judge or that Judge Coe failed to independently weigh the aggravating and mitigating circumstances at the time the sentencing order was prepared." 872 So.2d at 247. Accordingly, we reject Tompkins's argument.

Violation of Section 922.06(2), Florida Statutes
Next, Tompkins argues that Governor Crist's action on October 2, 2008, in resetting his execution, violated section *1084 922.06(2), Florida Statutes.[11] Specifically, Tompkins alleges that Governor Bush was required to reschedule his execution within ten days of the lifting of the stay of execution after this Court's decision in Tompkins IV became final, and therefore Governor Crist lacked the authority to reset the execution in October 2008. We conclude that the trial court did not err in summarily denying this claim. First, the claim is procedurally barred as untimely. This Court recently reiterated in Hunter v. State, 33 Fla. L. Weekly S721, S724, ___ So.2d ___, ___, 2008 WL 4348485 (Fla. Sept. 25, 2008):
Rule 3.851 requires motions filed beyond the time limitations to specifically allege that the facts on which the claim is predicated were unknown or could not have been ascertained by the exercise of due diligence. Fla. R.Crim. P. 3.851(d)(2)(A). Furthermore, the rule requires successive motions to articulate the reasons why a claim was not raised previously and why the evidence used in support of the claim was not previously available. Fla. R.Crim. P. 3.851(e)(2)(B), (e)(2)(C)(iv).
Tompkins failed in his fifth successive postconviction motion to explain why he could not have raised this claim in 2004, when Tompkins IV became final and the Governor failed to reschedule the execution date within ten days.[12] Tompkins attempts to circumvent the argument that he failed to raise this claim in a timely manner by arguing that he was under no obligation to make this claim until the Governor actually reset his execution in October 2008. Tompkins's argument concerning an excuse for his delay fails because he did not adequately assert it in the trial court. See Green v. State, 975 So.2d 1090, 1104 (Fla.2008) (finding a claim procedurally barred because it was neither raised in Green's 3.851 motion nor addressed by the trial court).
Second, even if Tompkins had raised this argument in the trial court, there is no authority that supports a claim that section 922.06(2) either explicitly or implicitly provides criminal defendants with any enforceable rights and, specifically, a "right" to a speedy execution. Further, shortly after Tompkins IV became final, Tompkins filed his third postconviction *1085 motion, the summary denial of which was not affirmed by this Court until 2007 in Tompkins VI.
Accordingly, the trial court did not err in summarily denying Tompkins's claim that Governor Crist violated section 922.06(2) in resetting his execution.

Length of Time on Death Row
Tompkins's next claim is that Governor Bush's failure to reset his execution in 2004 resulted in Tompkins remaining on death row for such a prolonged period of time, twenty-three years, that it constitutes cruel and unusual punishment in violation of the Eighth Amendment. We reject this claim as we have repeatedly done in the past. In Booker v. State, 969 So.2d 186 (Fla.2007), this Court recognized that "no federal or state court has accepted the argument that a prolonged stay on death row constitutes cruel and unusual punishment, especially where both parties bear responsibility for the long delay." Id. at 200; see also Gore v. State, 964 So.2d 1257, 1276 (Fla.2007) (holding that twenty-three years served on death row is not cruel and unusual punishment), cert. denied, ___ U.S. ___, 128 S.Ct. 1250, 170 L.Ed.2d 89 (2008); Elledge v. State, 911 So.2d 57, 76 (Fla.2005) (finding no merit in constitutional claim predicated on the cruel and unusual nature of prolonged stay on death row); Lucas v. State, 841 So.2d 380, 389 (Fla. 2003) (concluding that twenty-five years on death row does not constitute cruel and unusual punishment); Foster v. State, 810 So.2d 910, 916 (Fla.2002) (holding that twenty-three years on death row is not cruel and unusual punishment).
Further, Tompkins contributed to the delay of his execution by filing five postconviction motions. He cannot now contend that his punishment has been illegally prolonged because the delay in carrying out his sentence is in large part due to his own actions in challenging his conviction and sentence. As explained by this Court in Lucas:
In the twenty-five years since he was first found guilty of the murder of Jill Piper, Lucas has exercised his constitutional rights in challenging both the finding of guilt and his death sentence. The finding of guilt was upheld in his first direct appeal in 1979 and was not challenged in any of the subsequent appeals. Lucas is clearly guilty of the murder of Jill Piper, and it has been determined that the proper sentence is death. Lucas's exercise of his constitutional rights has prevented his sentence from being carried out. Lucas may not now claim that his punishment has been cruel and unusual as a result of his own actions in challenging his death sentence. Lucas's claim that he was entitled to an evidentiary hearing on this issue is without merit and is denied.
841 So.2d at 389.
Accordingly, in light of this Court's precedent, we conclude that the trial court did not err in summarily denying Tompkins's claim that his twenty-three years on death row constitutes cruel and unusual punishment.

Newly Discovered Evidence  Kimberly Quillin Affidavit
Tompkins argues that the trial court erred in summarily denying his newly discovered evidence claim based on the affidavit of one Kimberly Quillin. By way of background, Kathy Stevens testified at trial that she went to Lisa DeCarr's house alone at approximately 9 a.m. on the morning of March 24, 1983. After hearing a loud crash, Stevens opened the front door and saw Lisa on the couch struggling and hitting Tompkins, who was on top of her attempting to remove her clothing. Lisa asked Stevens to call the police. At that point, Stevens left the house, but did not call the police. Stevens testified that she *1086 later returned to the house with her friend Kim.[13]
On October 10, 2008, Tompkins obtained a sworn affidavit from Kimberly Quillin, formerly known as Kim Lisenby. In this affidavit, Quillin stated:
1. My name is Kimberly Quillin and I reside in Tampa, FL.
2. In 1983 I went by the name of Kim Lisenby and attended Middleton Junior High.
3. In March 1983 I do not remember anyone by the name of Kathy Stevens aka Mamroe aka Sample.
4. In March 1983 I do not remember anyone by the name of Lisa DeCarr.
5. I remember that while attending Middleton Junior High, a rumor that a body was found under a house.
6. In 1983 school started at 8:00 AM and I would have been on the bus from 7:15 AM to about 7:40 AM.
7. I do not remember any police officer, investigator or anyone else speaking to me about this matter.
8. In 1989, I was married and using the name Kimberly Kuhnie and moved to Washington.
In his fifth successive postconviction motion, Tompkins alleged that neither he nor counsel were able to locate and speak with Quillin previously, despite repeated attempts to find her, because Kathy Stevens testified that "Kim Lisenby" accompanied her to Lisa DeCarr's house. Tompkins asserted that his counsel exercised due diligence in trying to locate Kim Lisenby, who is now Kim Quillin. Tompkins contended that Quillin's affidavit contradicted Stevens's testimony.
We disagree with Tompkins's contention that the trial court erred in summarily denying this newly discovered evidence claim, but do so on the basis of the second prong of a newly discovered evidence claim rather than due diligence. To obtain a new trial based on newly discovered evidence, a defendant must meet two requirements: First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. See Jones v. State, 709 So.2d 512, 521 (Fla.1998) ("Jones III"). Newly discovered evidence satisfies the second prong of the Jones III test if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Jones III, 709 So.2d at 526 (quoting Jones v. State, 678 So.2d 309, 315 (Fla.1996) ("Jones II")). If the defendant is seeking to vacate a sentence, the second prong requires that the newly discovered evidence would probably yield a less severe sentence. See Jones v. State, 591 So.2d 911, 915 (Fla.1991) ("Jones I").
In determining whether the evidence compels a new trial, the trial court must "consider all newly discovered evidence which would be admissible," and must "evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." Id. at 916. This determination includes *1087 whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether this evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.
Jones III, 709 So.2d at 521 (citations omitted). The summary denial of a newly discovered evidence claim will be upheld if the motion is legally insufficient or its allegations are conclusively refuted by the record. McLin v. State, 827 So.2d 948, 954 (Fla.2002).
Although the trial court found that Tompkins's claim was untimely because Tompkins and counsel were aware of Quillin's existence, albeit under a different surname, as early as 1985, this Court need not address the timeliness of Tompkins's claim because the trial court properly summarily denied relief based on the second prong of Jones. This evidence is not "of such nature that it would probably produce an acquittal on retrial." Jones III, 709 So.2d at 521. The State presented the testimony of three key witnesses at trial  Barbara DeCarr, Kathy Stevens, and Kenneth Turco. Although Tompkins attempts to characterize Quillin's affidavit as significant new evidence, the affidavit has at best minimal impeachment value. Moreover, Stevens's affidavit does not constitute the type of evidence this Court has held requires an evidentiary hearing to determine whether it would probably produce an acquittal on retrial. This is not a case where an important witness has recanted his or her testimony, see Lightbourne v. State, 742 So.2d 238 (Fla.1999) (remanding for an evidentiary hearing to determine whether newly recanted testimony, when considered cumulatively with all of the post-trial evidence that indicated other witnesses testified falsely, required a new penalty phase hearing), or where the defense has credible new evidence that another person may have committed the murder. As this Court explained in Tompkins VI when evaluating Tompkins's claim that James Davis's affidavit was newly discovered evidence: "[N]one of the State's three `key witnesses'  Mrs. DeCarr, Stevens, or Turco  has recanted." 980 So.2d at 459. This Court also concluded in Tompkins VI in affirming the summary denial:
Tompkins' case is more akin to Sims v. State, 754 So.2d 657, 662-63 (Fla. 2000), in which the Court affirmed the denial of a newly discovered evidence claim based on hearsay statements that a person other than the defendant committed the crime. The Court noted that the evidence was admissible solely for impeachment purposes, did not place the alternative suspect at the scene of the crime, and did not affect the testimony of the three eyewitnesses who identified the defendant as the perpetrator. See id. at 662. The Court also observed that the defendant had not presented any evidence that directly refuted the State's case. See id. at 662-63.

Tompkins VI, 980 So.2d at 459.
Tompkins also asserts that when Quillin's affidavit is evaluated cumulatively with all of the "exculpatory evidence" learned during collateral proceedings, "it is clear that a reasonable juror would have had more than reasonable doubt about [Tompkins's] guilt and he would have been acquitted." However, we conclude that the motion, files, and records conclusively show that Tompkins is not entitled to relief. See McLin, 827 So.2d at 954. As explained in Tompkins VI, this Court in Tompkins IV affirmed the summary denial of Tompkins's Brady claims, concluding that "[e]ither the undisclosed documents are not Brady material because they are neither favorable to Tompkins nor suppressed, or Tompkins has not demonstrated *1088 that he was prejudiced by the lack of disclosure." Tompkins IV, 872 So.2d at 241; see also Tompkins VI, 980 So.2d at 459. The Court further concluded in Tompkins IV: "[E]ven if we were to engage in a cumulative analysis and consider the undisclosed, favorable documents in conjunction with Tompkins' claims raised in his first motion for postconviction relief, our conclusion as to prejudice would not change." 872 So.2d at 24-42. In Tompkins VI, this Court reached the same conclusion as to Davis's affidavit. 980 So.2d at 459. Even assuming the truth of each allegation, at the most Quillin asserts only that she does not remember anyone by the name of Kathy Stevens. On its face, it would appear that a possible explanation for Quillin's lack of memory is that twenty-five years have passed. However, we need not reach the credibility of the witnesses. Notably, none of the three main witnesses have ever recanted or changed their testimony. Because Quillin's affidavit is of marginal weight, it does not alter our prior conclusions that a cumulative analysis of the evidence favorable to Tompkins does not entitle him to a new trial.
Accordingly, the trial court did not err in summarily denying Tompkins's claim of newly discovered evidence in the form of Quillin's affidavit.

Ineffective Assistance of Postconviction Counsel
Tompkins next argues that the trial court erred in summarily denying his claim that postconviction counsel rendered ineffective assistance by negligently failing to obtain a legible copy of a March 24, 1983, police report, which Tompkins alleges demonstrates that an individual named Wendy Chancey reported seeing the victim alive and well after the time the State asserted that Tompkins had killed her. In an attempt to provide a legal basis for this claim, Tompkins contends that this Court's recent decision in Jimenez v. State, 33 Fla. L. Weekly S805, ___ So.2d ___, ___, 2008 WL 2445461 (Fla. June 19, 2008), implicitly overturned Lambrix v. State, 698 So.2d 247 (Fla.1996), which held that claims of ineffective assistance of postconviction counsel do not present a valid basis for relief. We disagree and reject this claim.
This Court did not implicitly overrule Lambrix in Jimenez. This Court has made it clear that it "does not intentionally overrule itself sub silentio." State v. Ruiz, 863 So.2d 1205, 1210 (Fla.2003) (quoting Puryear v. State, 810 So.2d 901, 905 (Fla. 2002)). In fact, this Court recognized in Jimenez that claims of ineffective assistance of postconviction counsel are not cognizable. See 33 Fla. L. Weekly at S807, ___ So.2d at ___ (concluding that Jimenez could not assert in his successive rule 3.851 motion that postconviction counsel was ineffective) (citing Kokal v. State, 901 So.2d 766, 777 (Fla.2005) ("We have repeatedly held that claims of ineffective assistance of postconviction counsel are not cognizable.")). Further, this Court recently reiterated its holding that ineffective assistance of postconviction counsel is not a cognizable claim in Gonzalez v. State, 990 So.2d 1017 (Fla.2008), a case decided after Jimenez. See Gonzalez, 990 So.2d at 1034 ("To the extent that Gonzalez is making an ineffective assistance of postconviction counsel claim, this Court has repeatedly rejected such a claim.") (citing Waterhouse v. State, 792 So.2d 1176 (Fla.2001); Lambrix).
Thus, the trial court did not err in summarily denying this claim.

Actual Innocence
In his next claim, Tompkins argues that the trial court erred in summarily denying his claim of actual innocence. Tompkins urges this Court to recognize a freestanding claim of actual innocence and permit him to present all exculpatory evidence *1089 as to his innocence. We reject this claim.
In Rutherford, this Court rejected the claim that Florida's failure to recognize a freestanding actual innocence claim violates the Eighth Amendment. 940 So.2d at 1117. Under Florida law, this Court reviews the sufficiency of the evidence on direct appeal. If new evidence subsequently surfaces, Florida law allows a defendant to bring a newly discovered evidence claim, as announced in Jones. As explained previously in this opinion, however, Tompkins fails to meet the test for newly discovered evidence based on the Quillin affidavit. This Court also determined in Tompkins VI that Tompkins failed to meet the newly discovered evidence test when he presented the Davis affidavit. 980 So.2d at 459. Further, to the extent Tompkins argues, as he seemingly did in his claim of ineffective assistance of postconviction counsel, that this Court should permit him to present the now-legible copy of the March 24, 1983, police report, this Court and the federal courts have repeatedly rejected Tompkins's similar arguments related to this report. See Tompkins II, 549 So.2d at 1372 (affirming trial court's denial of Tompkins's claim that his guilt-phase counsel was ineffective for failing to introduce the testimony of Wendy Chancey, who claimed to have seen Lisa DeCarr after the time the State contended the murder took place); Tompkins III, 193 F.3d at 1333-35 (affirming federal district court's denial of Tompkins's federal habeas petition raising the same ineffective assistance claim regarding Wendy Chancey as raised in Tompkins II); Tompkins IV, 872 So.2d at 239 (affirming the trial court's summary denial of Tompkins's Brady claim in his second postconviction motion, alleging that the State withheld the March 24, 1983, police report containing several statements made by Chancey).
In fact, the standard in Florida for a newly discovered evidence claim is more liberal than the standard for raising an actual innocence claim in federal courts. Under federal law, a defendant is required to produce "new reliable evidence  whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence  that was not presented at trial" for a claim of actual innocence to be considered. House v. Bell, 547 U.S. 518, 537, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) (quoting Schlup v. Delo, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)). Moreover, that new evidence must establish that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" in light of all of the available evidence. Id. at 537, 126 S.Ct. 2064 (quoting Schlup, 513 U.S. at 327, 115 S.Ct. 851). "`[A]ctual innocence' means factual innocence, not mere legal insufficiency." Bousley v. United States, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). Moreover, the federal courts have required that defendants asserting actual innocence show that they have been diligent in presenting their claims. See Gildon v. Bowen, 384 F.3d 883, 887 (7th Cir. 2004); Baker v. Norris, 321 F.3d 769, 772 (8th Cir.2003); David v. Hall, 318 F.3d 343, 347 (1st Cir.2003); Flanders v. Graves, 299 F.3d 974, 978 (8th Cir.2002). Here, Tompkins does not present any new, reliable evidence establishing that he is factually innocent of the crime. At most, the series of postconviction motions he filed attempted to impeach the three main witnesses, none of whom have changed the significant inculpatory aspect of their testimony. Turco's testimony that Tompkins told him he killed Lisa and buried her under the house remains unrefuted, as does Stevens's testimony that Tompkins was last seen on top of Lisa and Barbara DeCarr's testimony that Tompkins lied to *1090 her and told her that Lisa ran away. Therefore, Tompkins not only fails, and has failed in the past, to meet the newly discovered evidence standard with regard to the allegedly exculpatory evidence he asserts, but he also fails to meet the first requirement of the federal standard as articulated in House.[14]
Accordingly, the trial court did not err in summarily denying Tompkins's actual innocence claim.

Public Records
Tompkins's final argument in his appeal is that the trial court erred in summarily denying his claim that he was deprived of his rights under chapter 119, Florida Statutes, and Florida Rule of Criminal Procedure 3.852, when the trial court granted the objections of FDLE and DOC to his public records requests. We disagree.
The record conclusively shows that Tompkins is not entitled to relief on this claim because the records he requested from DOC and FDLE were neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this case, as required by rule 3.852(i)(2)(C).[15] The trial court had already rejected Tompkins's lethal injection claim in his fourth successive motion for postconviction relief, on March 17, 2008. See Rutherford v. State, 926 So.2d 1100, 1115-17 (Fla.2006) (affirming trial court's summary denial of Rutherford's public records requests in part because "the records sought from these agencies are not related to a colorable claim for postconviction relief because the scientific evidence Rutherford relies on does not require this Court to reconsider our holding that Florida's lethal injection procedure does not violate the Eighth Amendment"). Further, Tompkins failed to allege that anything had changed since the time the trial court denied his fourth successive postconviction motion to warrant the court revisiting its decision. See Rodriguez v. State, 919 So.2d 1252, 1273-74 (Fla.2005) (upholding denial of public records requests where the defendant "has not met his burden of showing that the allegedly missing records will lead to new information"). As explained previously in connection with our discussion of lethal injection, since the trial court issued its order rejecting Tompkins's lethal injection claim, this Court has repeatedly upheld summary denial of challenges to Florida's lethal injection procedure. See Power, 992 So.2d at 223; Sexton, 33 Fla. L. Weekly at S691, ___ So.2d at ___; Henyard, 992 So.2d at 132. Moreover, there have been no allegations of any specific problems with Florida's lethal injection procedures following the Schwab and Henyard executions that might give rise to a different Eighth Amendment claim than the one rejected in Lightbourne. As we explained in Lightbourne,
Our precedent makes clear that this Court's role is not to micromanage the executive branch in fulfilling its own duties relating to executions. We will not second-guess the DOC's personnel decisions, so long as the lethal injection protocol reasonably states, as it does here, relevant qualifications for those individuals who are chosen.
969 So.2d at 351.
Thus, the trial court did not err in summarily denying Tompkins's claim that he *1091 was deprived of his rights under chapter 119, Florida Statutes, and rule 3.852, when the trial court granted FDLE's and DOC's objections to his public records requests.

Tompkins's Motion for Relinquishment of Jurisdiction for Consideration of New Evidence
Finally, we address Tompkins's most recent allegations set forth in his motion for relinquishment filed in this Court on November 3, 2008. The motion requested that we relinquish jurisdiction to the trial court so that he could present a rule 3.851 motion premised on the recent disclosure by the State of a sworn statement of one of the key witnesses, Kenneth Turco, taken on October 28, 2008.[16] In this statement, Turco stated that a defense investigator came to his home in 2003 to speak to him regarding this case. Turco stated that the defense investigator asked him to "sign an affidavit as to what Michael Bonito[17] [sic] had to offer in the case." Turco stated that he told the defense investigator that he would not sign the affidavit. When asked by the State what the defense investigator was talking about regarding Benito and the affidavit, Turco replied:
Well, Michael Bonito [sic] at the time of my  prior to the testimony, and naturally we met at the Hillsborough County jail, went into a little room and as I was telling him what happened he told me  he said  he told me, he said don't forget the purse. She was buried with a purse. Make sure you add that in your testimony, and I did.
Turco then confirmed that everything he testified to at trial was the truth except for the testimony about the pocketbook, which the State told him to mention.
We denied this motion by order dated November 4, 2008.[18] We also struck two footnotes from the State's response suggesting improper investigative tactics on the part of the defense investigator. The dissent states that Turco's allegations that the State told him not to "forget the purse" were unrefuted. However, in a separate sworn statement by Benito, dated October 23, 2008, also provided by the State, he emphatically denied any wrongdoing. Nevertheless, for the purpose of summary disposition, we have evaluated this claim as one brought under Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and also assumed that the defense did not know of this evidence in 2003. We thus have assumed the truth of Turco's statement that Benito told Turco to mention the pocketbook in his testimony. In Rhodes v. State, 986 So.2d 501 (Fla.2008), this Court explained:
To establish a Giglio violation, a defendant must show that: (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. See Guzman v. State, 941 So.2d 1045, 1050 (Fla.2006). Once the first two prongs are established, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury's verdict. See id. Under this standard, the State has the burden to prove that the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt. Id.; see also Mordenti *1092 v. State, 894 So.2d 161, 175 (Fla. 2004).
Rhodes, 986 So.2d at 508-09. Even assuming the first two elements of the Giglio test, as a matter of law, Tompkins cannot satisfy the third element. Even if the State knowingly presented false testimony about Tompkins telling Turco that he buried Lisa DeCarr's pocketbook, there is no reasonable possibility that it could have affected the jury's verdict and would thus be harmless beyond a reasonable doubt. Turco's testimony that Tompkins told him he killed Lisa and buried her under the house remains unrefuted, as do all of the other details of his testimony.[19] Rather than recanting the details of his testimony, Turco was emphatic in his October 2008 statement that Tompkins had confessed the details of this crime to him:
THE STATE: Okay. Going back to the testimony that you provided at the deposition and then at the trial, did you give the deposition and trial from information that somebody told you other than Wayne Tompkins?
TURCO: No, sir. The testimony I gave solely came from Mr. Tompkins himself, and I couldn't live with it on my conscience and I was already going to get two years probation for the charge I was in there for which was escape from a work release center which was no great big thing to me at the time, and that's it, you know.
. . . .
THE STATE: And then your testimony regarding who killed the victim when Mr. Tompkins told you about that?
TURCO: Is true.
THE STATE: That's the truth?
TURCO: Yes. The whole testimony is the truth except about the part about the purse.
. . . .
THE STATE: Okay. Mr. Turco, that's all the questions I have. Is there anything else that you testified to that was not told to you by Mr. Tompkins or anything else that Mr. Bonito [sic] told you that you didn't tell me or anything like that?
TURCO: (Shakes head negatively). No. I gave the truth. I told the truth. It's that simple. You know, I didn't do it for any deal. I did it for my conscience more than anything. . . .
Thus, Tompkins's Giglio claim fails because the allegedly false testimony does not satisfy the third element of Giglio.

CONCLUSION
For the reasons discussed above, we affirm the trial court's summary denial of Tompkins's fourth and fifth successive motions for postconviction relief and we also deny his petition for all writs jurisdiction, or alternatively for writ of habeas corpus, or both.[20]
*1093 It is so ordered.
WELLS, PARIENTE, LEWIS, and POLSTON, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion.
QUINCE, C.J., and CANADY, J., recused.
ANSTEAD, J., concurring in part and dissenting in part.
I cannot agree with the majority's summary rejection of the defendant's unrefuted claim that the State unlawfully manufactured critical evidence against him. It is apparent on the face of the claim that its proper resolution requires evidentiary development before a trier of fact who, among other things, can make credibility determinations.
In Craig v. State, 685 So.2d 1224 (Fla. 1997), we reversed a death sentence and explained just how serious a Giglio claim asserting prosecutorial misconduct should be treated:
To establish a Giglio violation, Craig must show: (1) that the testimony was false; (2) that the prosecutor knew the testimony was false; and (3) that the statement was material. Id. If there is a reasonable possibility that the false evidence may have affected the judgment of the jury, a new trial is required. Giglio, 405 U.S. at 154, 92 S.Ct. at 765; Routly [v. State], 590 So.2d [397] at 400 [Fla.1991]. We noted in Routly that under Giglio and [United States v.] Bagley[, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)], "the prosecutor has a duty to correct testimony he or she knows is false when a witness conceals bias against the defendant through that false testimony." 590 So.2d at 400; see also United States v. Meros, 866 F.2d 1304, 1309 (11th Cir.), cert. denied, 493 U.S. 932, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989). We further stated, "The thrust of Giglio and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony, and that the prosecutor not fraudulently conceal such facts from the jury." Id. (quoting Smith v. Kemp, 715 F.2d 1459, 1467 (11th Cir.), cert. denied, 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699 (1983)); accord Alderman v. Zant, 22 F.3d 1541, 1554 (11th Cir.1994).[N.4]
[N.4] See also Dupart v. United States, 541 F.2d 1148 (5th Cir.1976), wherein the Fifth Circuit analyzed the testimony of a government witness in light of the Giglio standard and further noted that "assuming the allegations to be true, such a formalistic exchange of testimony even though technically not prejurious, would surely be highly misleading to the jury, a body generally untrained in such artful distinctions." Id. Accord United States v. Ruiz, 711 F.Supp. 145 (S.D.N.Y.1989) (restating the Giglio rule that "if conviction was obtained through the use of false or misleading evidence which was known to be so by the government, the conviction cannot stand."), aff'd, 894 F.2d 501 (2d Cir. 1990).
Id. at 1226-27. Because of the important and unique significance of a claim of prosecutorial misconduct, the United States Supreme Court held in Giglio that only a "reasonable possibility" of an effect on the jury need be demonstrated to merit relief. See Ruiz, 711 F.Supp. at 147 ("[I]f the *1094 conviction was obtained through the use of false or misleading evidence which was known to be so by the government, the conviction cannot stand.").
Initially, we should consider the seriousness of the flagrant misconduct that has been disclosed by the State to the defendant and that forms the basis of the constitutional claim. No one disputes that the most critical evidence of defendant's guilt was presented by a witness commonly referred to as a "jailhouse snitch." Of course, the credibility of such a witness is questionable at best, although the State has to take the evidence as it finds it. However, we now find out from the State itself that this crucial witness's evidence was unlawfully tampered with by the State's prosecutor. The record reflects that the prosecutor believed that it would be very important to the State's case for the defendant to have told the jailhouse snitch that he buried the victim's purse with the victim. The snitch did not remember being told this by the defendant, but upon urging by the prosecutor added this important, but false, evidence to his testimony. But now, if we are to accept the State's most recent interview with this crucial witness, the snitch's evidence about the purse was a fabrication, a lie supplied by the State's prosecutor. Indeed, if the claim is true we have a state prosecutor who committed a criminal act in tampering with a witness.
The majority, instead of allowing a trial judge, as a trier of fact, to receive and consider this evidence of the prosecutor's misconduct as well as evaluating whether the snitch may have lied about other matters, simply concludes that the snitch's credibility remains intact about his other testimony and, hence, that inculpatory evidence has not been affected. The majority just surgically removes this false evidence from the case against the defendant and then concludes that enough evidence still remains to convict. In my view, however, that is not the standard for analysis that our case law requires when a Giglio violation is asserted, and, especially when such a claim is not only unrefuted, but is, in fact, disclosed by the State.
Imagine here a jury already concerned with the credibility of a jailhouse snitch now being told that a critical part of his testimony was fabricated by the State's prosecutor. Surely, common sense would tell us this is the kind of "bombshell" disclosure that could change the jury's entire evaluation of the case. In the face of such a disclosure a jury would not only reevaluate the evidence of the snitch, it would naturally give extra scrutiny to a case presented by a prosecutor who has fabricated evidence and tampered with a witness. Surely, at the very least, there is a reasonable possibility this dramatic disclosure would affect the jury's evaluation of the State's case.
For all these reasons, I cannot join in the majority's summary rejection of this claim of prosecutorial misconduct, especially under the circumstances of this case where the defendant is under a pending warrant of execution.
NOTES
[1] On October 2, 2008, Governor Charlie Crist reset Tompkins's execution for October 28, 2008, at 6:00 p.m., based on Tompkins's third death warrant, signed by former Governor Jeb Bush on March 22, 2001. However, this Court entered an order staying execution until November 18, 2008, because Tompkins's appeal of the trial court's denial of his fourth postconviction motion was pending and briefing had not yet been completed. The first death warrant was issued on March 30, 1989, followed by a second death warrant on November 9, 1989.
[2] These opinions include this opinion and the following: Tompkins v. State, 502 So.2d 415, 417-18 (Fla. 1986) ("Tompkins I"), cert. denied, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 781 (1987); Tompkins v. Dugger, 549 So.2d 1370, 1372 (Fla.1989) ("Tompkins II"), cert. denied, 493 U.S. 1093, 110 S.Ct. 1170, 107 L.Ed.2d 1073 (1990); Tompkins v. Moore, 193 F.3d 1327 (11th Cir.1999) ("Tompkins III"), cert. denied, 531 U.S. 861, 121 S.Ct. 149, 148 L.Ed.2d 99 (2000); Tompkins v. State, 872 So.2d 230 (Fla.2003) ("Tompkins IV"); Tompkins v. State, 894 So.2d 857, 859 (Fla.2005) ("Tompkins V"); Tompkins v. State, 980 So.2d 451, 455 (Fla.2007) ("Tompkins VI"), cert. denied, ___ U.S. ___, 128 S.Ct. 895, 169 L.Ed.2d 747 (2008); and Tompkins v. Singletary, No. 89-1638-CIV-T-99B, 1998 U.S. Dist. LEXIS 22582 (M.D.Fla. Apr. 17, 1998).
[3] In August 2002, while Tompkins's previous appeal to this Court in Tompkins IV was pending, Tompkins filed a motion to relinquish jurisdiction to allow the trial court to consider this newly discovered evidence claim. This Court denied the motion and Tompkins filed his third postconviction motion in the trial court. The trial court dismissed the motion for lack of jurisdiction due to the pending appeal. This Court affirmed the trial court's order, but gave Tompkins "60 days to refile his successive postconviction motion nunc pro tunc to February 5, 2003, the date his prior motion was filed in the trial court." Tompkins V, 894 So.2d at 859.
[4] Tompkins filed demands for public records with the Florida Department of Law Enforcement ("FDLE") and the Department of Corrections ("DOC") seeking documents related to the Schwab and Henyard executions, and the training of execution team members. The FDLE and DOC objected to the demands, arguing in part that Tompkins failed to show the public records were relevant or reasonably calculated to lead to the discovery of admissible evidence. The trial court agreed and granted the objections. Tompkins also filed demands for public records with the Attorney General ("AG") and the Governor's office seeking documents related to his execution. Both the AG and the Governor's office produced documents in response.
[5] Tompkins was a member of the group of death row inmates who filed an emergency all writs petition in Lightbourne, requesting that this Court address whether Florida's lethal injection procedures violate the Eighth Amendment in the wake of the allegedly "botched" execution of Angel Diaz in December 2006. See id. at 328-29. This Court dismissed the claims of all of the petitioners except petitioner Lightbourne without prejudice. Lightbourne v. McCollum, No. SC06-2391 (Fla. order dated February 9, 2007).
[6] The Florida Constitution's prohibition against "cruel or unusual punishment" "shall be construed in conformity with decisions of the United States Supreme Court which interpret the prohibition against cruel and unusual punishment provided in the Eighth Amendment to the United States Constitution." Art. I, § 17, Fla. Const.
[7] This Court also rejected this claim in Marquard v. State, No. SC08-148, 993 So.2d 513, 2008 WL 4748574 (Fla. order dated Sept. 24, 2008).
[8] We also reject Tompkins's claim that his due process rights were violated by an ex parte communication between the trial judge and the prosecutor concerning the need for an evidentiary hearing on Tompkins's lethal injection claim. The ex parte communication was not improper because it did not constitute a substantive discussion on the merits of Tompkins's case. See Jimenez v. State, 33 Fla. L. Weekly S805, S809, ___ So.2d ___, ___, 2008 WL 2445461 (Fla. June 19, 2008) (finding ex parte communication between judge and prosecutor not improper where the record established that the judge engaged in the conversation for strictly administrative reasons and the communication did not constitute a substantive discussion concerning the merits of the case); see also Fla.Code of Jud. Conduct, Canon 3 B(7).
[9] The trial court granted a new penalty phase because it concluded that an improper ex parte communication occurred when the sentencing judge contacted the prosecutor and asked him to prepare the sentencing order which the judge then signed. The trial court determined that the sentencing judge failed to independently weigh the aggravating and mitigating circumstances. Tompkins IV, 872 So.2d at 244-45.
[10] The prior cases Tompkins refers to include Roberts v. State, 840 So.2d 962 (Fla.2002); State v. Riechmann, 777 So.2d 342 (Fla.2000); and Card v. State, 652 So.2d 344 (Fla.1995).
[11] Section 922.06 provides:

(1) The execution of a death sentence may be stayed only by the Governor or incident to an appeal.
(2)(a) If execution of the death sentence is stayed by the Governor, and the Governor subsequently lifts or dissolves the stay, the Governor shall immediately notify the Attorney General that the stay has been lifted or dissolved. Within 10 days after such notification, the Governor must set the new date for execution of the death sentence.
(b) If execution of the death sentence is stayed incident to an appeal, upon certification by the Attorney General that the stay has been lifted or dissolved, within 10 days after such certification, the Governor must set the new date for execution of the death sentence.
When the new date for execution of the death sentence is set by the Governor under this subsection, the Attorney General shall notify the inmate's counsel of record of the date and time of execution of the death sentence.
§ 922.06, Fla. Stat. (2004) (emphasis supplied).
[12] Public records were disclosed on October 14, 2008, in the form of correspondence between the Governor's office and the AG's office in 2001 concerning whether there was any potential for DNA testing in this case because the Governor had a policy not to sign a death warrant in a case in which DNA testing had not been conducted. These records in no way establish that the Governor was obligated to reschedule Tompkins's execution once the stay had expired, as Tompkins suggests. Rather, they merely indicate that the Governor had a specific policy with regard to DNA testing and death warrants.
[13] Stevens's trial testimony conflicted with her deposition testimony. In her deposition, Kathy testified that her friend Kim was with her when she saw Lisa being strangled. Stevens testified at her deposition that when she was at the front door to Lisa's house, Kim was standing by the garage near an alley by Lisa's house. Stevens testified that she shut the door after Lisa told her to call the police and then told Kim, "Come on, Kim we got to call the police." Kim told Stevens not to get involved and Stevens said, "okay."
[14] We have also considered the newest allegations regarding Turco raised in Tompkins's motion for relinquishment of jurisdiction for consideration of new evidence.
[15] Rule 3.852(i)(2)(C) mandates that the trial court order an agency to produce additional public records only upon a finding that, inter alia, "the additional public records sought are either relevant to the subject matter of a proceeding under rule 3.851 or appear reasonably calculated to lead to the discovery of admissible evidence."
[16] Realizing Turco's statement contained exculpatory evidence for Tompkins, the State immediately disclosed it to Tompkins's defense lawyer, which then gave rise to the motion to relinquish.
[17] Michael Benito was the prosecutor who handled Tompkins's trial.
[18] Justice Anstead dissented to the denial of the motion to relinquish and would have allowed the trial court to address the issues raised as a result of Turco's recent sworn statement provided by the State.
[19] Justice Anstead refers to Turco in his dissent as a crucial witness and asserts that this issue must be tested by an evidentiary hearing. We have explained our reasoning for disagreeing that relinquishment is necessary. We would also point out that in Tompkins VI we affirmed a summary denial based on alleged impeachment of Kathy Stevens. Stevens was the person who saw a portion of Tompkins's attack on the victim. Further, Turco corroborated all of the critical details of the crime and never suggested in his statement made twenty-five years after the crime that the State suggested any of the other details of the crime. Certainly if Turco was now belatedly recanting his testimony and suggesting that the State told him to testify falsely we would have considered granting a motion to relinquish.
[20] We summarily deny Tompkins's petition without further discussion because each of the five claims are identical to the issues raised in the appeals of the orders currently before us in this opinion. The petition raised the following five claims: (1) the Governor's failure to comply with section 922.06(2) concerning the rescheduling of his execution; (2) Tompkins's prolonged time on death row; (3) ineffective assistance of collateral counsel for failing to obtain a legible copy of the March 24, 1985, police report; (4) actual innocence; and (5) Florida's lethal injection procedure constitutes cruel and unusual punishment under the Eighth Amendment.