841 So.2d 380 (2003)
Harold Gene LUCAS, Appellant,
v.
STATE of Florida, Appellee.
Harold Gene Lucas, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC01-1633, SC02-314.
Supreme Court of Florida.
January 9, 2003.
Rehearing Denied March 14, 2003.
*381 Robert T. Strain, Assistant CCRC, and Elizabeth A. Williams, Staff Attorney, Capital Collateral Regional CounselMiddle Region, Tampa, FL, for Appellant/Petitioner.
*382 Charlie Crist, Attorney General, and Carol M. Dittmar, Senior Assistant Attorney General, Tampa, FL, for Appellee/Respondent.
PER CURIAM.
Harold Gene Lucas appeals the denial of his motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. Lucas also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons set forth below, we affirm the trial court's order denying Lucas's motion for postconviction relief and deny Lucas's petition for a writ of habeas corpus.

FACTS AND PROCEDURAL HISTORY
This case has an extensive procedural history that includes five direct appeals with decisions following from this Court. Having overturned the sentence of death in four previous appeals,[1] this Court upheld Harold Gene Lucas's death sentence in 1992 in his fifth direct appeal. See Lucas v. State, 613 So.2d 408 (Fla.1992) ("Lucas V"). Lucas was originally found guilty and sentenced to death for the first-degree murder of Jill Piper. See Lucas I, 376 So.2d at 1150. In that first direct appeal, this Court detailed the facts of the crime:
The victim, Jill Piper, was [Lucas's] girlfriend. A week before her death, she and [Lucas] became embroiled in a heated argument which continued for several days. On the night of the murder, [Lucas] arrived at Jill's house carrying a shotgun. Anticipating a visit by [Lucas], the victim and her friends, Terri Rice and Ricky Byrd, armed themselves. They were surprised, however, when [Lucas] suddenly appeared from the side of the house, catching them in the yard, and began shooting. Jill Piper was struck immediately, but Terri and Ricky ran unharmed into the house to hide in a bedroom. The evidence is unclear as to what next occurred. According to Ricky's testimony, Jill came into the house, struggled with [Lucas], and was shot several more times. In any event, [Lucas] soon burst into the bedroom where Ricky and Terri were hiding and shot them. Jill's body was found outside the house.
Id. at 1150.[2]
The first direct appeal was the only proceeding in which Lucas challenged the guilt stage of his trial. In that action, he argued the trial court committed reversible error in allowing an undisclosed rebuttal witness to testify. See id. Although this Court determined that the State had in fact not complied with the rule which requires the State to notify the defense of any rebuttal witness that the State can reasonably anticipate calling, this Court concluded that the defense attorney had not made a timely objection, and therefore Lucas's claim was denied and his conviction was upheld. See id. at 1151-52, 1154.
In his first direct appeal, Lucas also made several claims attacking his death sentence. Notably, he argued the trial court erred in finding the heinous, atrocious, or cruel ("HAC") aggravating factor. See id. at 1153. This Court upheld the *383 finding of HAC, writing: "The evidence shows (at least by one witness's version) that appellant shot the victim, pursued her into the house, struggled with her, hit her, dragged her from the house, and finally shot her to death while she begged for her life." Id. However, this Court remanded the case for resentencing without the benefit of a new sentence recommendation by a jury because the trial court erred in finding a nonstatutory aggravating factor, namely that the attempted murders were heinous and atrocious. See id.
In his second direct appeal, Lucas argued that in sentencing him to death a second time, the sentencing judge "abused his discretion by not properly reweighing and reevaluating the valid aggravating and mitigating circumstances." Lucas II, 417 So.2d at 250. This Court agreed and again remanded for resentencing. See id. at 252.
Before his third sentencing, Lucas's original trial judge died, and therefore his resentencing proceeding was conducted before a different judge. This judge refused to hear additional evidence, considered only the record before him, and again sentenced Lucas to death. See Lucas III, 490 So.2d at 945. On appeal, this Court held the sentencing judge should have permitted both sides to present additional testimony and argument, and therefore again reversed and remanded, this time instructing the trial judge to empanel a jury for a completely new penalty phase proceeding. See id. at 946.
The fourth penalty phase proceeding was held in 1987. The jury again recommended death, which the trial court imposed. See Lucas IV, 568 So.2d at 20. On appeal, Lucas raised several claims. This Court agreed with Lucas on one of his claimsthat the trial court's sentencing order did not clearly set forth the aggravating and mitigating factors that had been considered. See id. at 23. This Court once again remanded to the trial court, instructing the court to reconsider the findings of fact and permit both sides to present argument regarding the nonstatutory mitigating circumstances Lucas wished to have considered. See id. at 24.
In Lucas V, which followed the imposition of Lucas's fifth death sentence, Lucas challenged, among other things, the trial court's finding of HAC as to the murder of Jill Piper. See Lucas V, 613 So.2d at 410. This Court upheld the finding of HAC, noting that the facts showed the murder was heinous, atrocious, or cruel.[3] As noted above, this Court upheld Lucas' sentence of death for the murder of Jill Piper. See id. at 411.
Lucas filed his original rule 3.850 motion challenging his death sentence on October 3, 1994. He subsequently filed three amended motions, with the most recent amendment being filed on January 19, 1999. On July 6, 2000, the trial court held a Huff[4] hearing and determined the court would hold an evidentiary hearing on two of Lucas's seven claims,[5] and decide the remaining claims, which the court ruled *384 were purely legal in nature, based upon submissions of counsel.[6] Following the evidentiary hearing, held in August and October of 2000, the trial court denied all seven of Lucas's claims. This appeal followed. At the time he filed his rule 3.850 appeal, Lucas also filed a petition for a writ of habeas corpus, in which he challenges the constitutionality of Florida's death penalty statute.

3.850 APPEAL
Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
A claim of ineffective assistance of counsel, to be considered meritorious, must include two general components. First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the proceeding that confidence in the outcome is undermined.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986). This Court further explained that a court considering a claim of ineffectiveness of counsel "need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied." Id. This Court recently held that "[t]o establish prejudice, `[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Gaskin v. State, 822 So.2d 1243, 1246-47 (Fla.2002) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). Because ineffective assistance of counsel claims present a mixed question of law and fact, they are subject to plenary review based on the Strickland test. See id.; see also Stephens v. State, 748 So.2d 1028, 1033 (Fla.1999). Under this standard, this Court conducts an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings. See id.
Lucas contends that his counsel during his 1987 resentencing was ineffective for failing to show, through testimony from expert crime scene analysts, that Jill Piper was neither beaten nor dragged. He argues that with the presentation of such evidence, his counsel could have negated the HAC aggravator, and was ineffective in not doing so. In his final direct appeal, Lucas challenged the finding of HAC, asserting that the facts did not establish the aggravator. See Lucas V, 613 So.2d at 410. This Court disagreed and held the finding of HAC was proper. See id. at 411. In so doing, this Court detailed the facts, as found by the sentencing court, that supported HAC:
[D]uring several days preceding [the victim's] murder the defendant communicated threats which, based upon the testimony and evidence surrounding events leading up to the fatal event, were reasonably interpreted by the victim to be death threats. The evidence establishes that the victim was cognizant of these threats and justifiably terrified by *385 threats which involved the use of weapons. The defendant continued to threaten her during the hours preceding the murder. It is apparent from the victim's action in seeking the company of friends, the availability of defensive weapons, and the possible concealment of her vehicle, that she was taking steps out of fear and apprehension of a possible attack on the evening she was murdered. From these circumstances the Court concludes that the victim was aware that she was in mortal danger and reacted to the tremendous fear created by the defendant's threats.
The defendant sought the victim out at her residence where he had previously been arrested the preceding week for trespassing after a warning by law enforcement officers to stay away from [her]. The evidence establishes beyond a reasonable doubt that the defendant purposely and knowingly armed himself in preparation for this crime and stalked [the victim] at her home and carried out his murderous attack in a manner such that [she] was not able to reasonably defend herself. The defendant fired several shots from the dark shadows of the night outside of [her] residence, striking her in the back and severely wounding her. It is further established beyond every reasonable doubt that the victim did not die instantaneously nor painlessly, but that after these initial shots the defendant pursued the victim and proceeded to savagely beat her as she pled for her life with words to the effect, "Oh God, don't kill me, Oh God, leave me alone." The 16 year old girl fought in defense of her life and incurred defensive wounds which were not present prior to this crime. The severely wounded victim, who had every reasonable basis to be in great fear for her life based upon prior threats from the defendant, was now reduced to pitifully pleading for her life as the 24 year old defendant beat her and inflicted further injuries upon her. The Court finds that the evidence establishes beyond a reasonable doubt that [she] would have been in great physical pain from the gunshot wounds to the back and the savage beating she was receiving, as well as extreme mental anguish with the realization that the defendant was in fact carrying out his threats and that her life was in mortal danger.
With the 16 year old victim having endured these horrible circumstances of being threatened, wounded and beaten, the defendant then fired another series of shots which included the fatal shot. This shot struck the victim in the forehead at such an angle to establish beyond reasonable doubt the physical inferiority of the victim's position and further establishing that the victim, severely injured and overpowered was continuing to beg for her life. Although it is established by Dr. Graves' testimony that the victim was rendered unconscious instantaneously by the shot he identified as wound No. 1, it is more importantly apparent beyond a reasonable doubt that this wound was not received until the victim had endured prior gunshot wounds and a severe beating with the full realization that the defendant intended to murder her. This was not an instantaneous nor painless death, but a savage and brutal death which was torturous to the victim upon whom a high degree of pain had been inflicted by the defendant with an utter indifference to and savage enjoyment of the suffering [she] was undergoing.
Id. at 411 n. 5.
Despite Lucas's current contention that his 1987 penalty phase counsel should have presented more testimony in an attempt *386 to rebut the finding of HAC, there is nothing in the current postconviction record to show that any additional testimony would have been persuasive. Initially, as to the evidence that could have been presented to possibly demonstrate that Piper was not dragged, any such evidence would have been irrelevant because the sentencing court did not place any reliance upon any evidence that Piper had been dragged when the court determined that the HAC aggravator had been established. See Lucas V, 613 So.2d at 411 n. 5. Lucas' counsel could not have been ineffective for failing to refute evidence that was not relied upon in a material way by the court in its ruling. Because the court did not rely upon any evidence that was directed to showing that Piper had been dragged during the murder, Lucas was not prejudiced by his counsel's failure to present evidence that Piper had not been dragged.
Further, Lucas's counsel was also not ineffective for failing to present evidence rebutting the State's claim that Piper suffered through a physical beating during the commission of the murder. During the postconviction evidentiary hearing, Lucas presented two experts in an attempt to demonstrate that Piper was not beaten during the crime. The medical examiner who performed the original autopsy on Piper testified that based on the entirety of his examination, there was no evidence to suggest Piper suffered any kind of beating. However, he also testified that Piper had cuts on her hands and arms that were characteristic of defensive wounds, as if Piper was fending off an attack by a knife or some other sharp instrument. Lucas's second expert, a forensic consultant, testified that in his opinion, based on his study of the crime scene photographs, the evidence does not show that a beating occurred inside the house. However, during cross-examination, he testified that the evidence does not contradict the State's assertion that Piper was shot several times outside the residence, was then inside the home screaming, and eventually suffered the fatal gunshot wound to the head outside her home.
It is clear that the additional evidence presented during the evidentiary hearing would not have affected the original 1987 ruling as to the existence of the HAC aggravator. The sentencing judge based his ruling on the totality of the circumstances, which included evidence that Piper was shot numerous times in the back and the head, was pursued into her home, and suffered defensive wounds. As this Court stated in Lucas's first direct appeal when we upheld the finding of HAC, "The evidence shows (at least by one witness's version) that appellant shot the victim, pursued her into the house, struggled with her, hit her, dragged her from the house, and finally shot her to death while she begged for her life." Lucas I, 376 So.2d at 1153.
Lucas has not provided any conclusive, uncontroverted evidence that could have been presented in 1987 to dispel the findings of fact relied upon by the 1987 sentencing court, and this Court, to support the HAC aggravator. Lucas's 1987 counsel, Robert Jacobs, testified during the evidentiary hearing that he attempted to argue that the HAC aggravator was not present based upon the fact that all six shell casings were found outside the home, that the only evidence that placed Piper inside the home was the testimony of one of the other victims, and that the medical examiner testified that the gunshot wound to the head had produced instantaneous death and that wound could have been the first inflicted. Further, the record from the 1987 sentencing proceeding shows that Jacobs fully challenged the evidence relating to the HAC aggravator. The finding *387 of HAC was proper under the evidence, and the additional evidence asserted during the postconviction evidentiary hearing would not have altered that finding. Lucas's counsel was not ineffective in his representation in the 1987 resentencing.
In his second claim, Lucas asserts that his 1977 trial counsel was ineffective for failing to determine the particular drug, aside from alcohol and marijuana, Lucas ingested on the day of the crime, and for failing to present evidence of the effect that drug had on him at the time the crime was committed. He contends that as a result of his original trial counsel's inaction in 1977, he was limited during his resentencing in 1987 as to the drug evidence that could be introduced in mitigation. In other words, Lucas is claiming he was prejudiced in his 1987 resentencing as a result of the ineffectiveness of his 1977 trial counsel. Because the record clearly reflects Lucas did not suffer any prejudice in his 1987 resentencing, and in fact evidence regarding his use of drugs was introduced, it is unnecessary to consider the first prong of the Strickland test. Lucas's claim fails under the second prong.
Initially, it is clear Lucas was not procedurally barred from introducing specific drug evidence during his 1987 resentencing as a result of specific drug evidence not being produced in his 1977 trial. This Court has held that a resentencing is a completely new proceeding. See, e.g., Way v. State, 760 So.2d 903, 917 (Fla. 2000); Preston v. State, 607 So.2d 404, 409 (Fla.1992); Teffeteller v. State, 495 So.2d 744, 745 (Fla.1986). It therefore necessarily follows that a resentencing court is not limited by evidence presented (or not presented) in either the original guilt phase or sentencing phase. Further, in 1987, Florida's death penalty statute had, at that time, as it does today, broad rules regarding the introduction of evidence during the penalty phase of a capital case:
In the proceeding, evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (5) and (6). Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the Constitution of the State of Florida. The state and the defendant or the defendant's counsel shall be permitted to present argument for or against sentence of death.
§ 921.141(1), Fla. Stat. (1987). Clearly, Lucas was not procedurally barred during his resentencing from introducing specific drug evidence that was not produced during his original trial in 1977.
Lucas maintains that his 1977 trial counsel should have investigated and determined conclusively that Lucas had ingested PCP on the day of the crime. Further, having determined his consumption of PCP, as opposed to another drug known as THC, his trial counsel should have presented evidence as to the effects of PCP. However, despite Lucas's trial counsel's failure to determine exactly what drug Lucas ingested on the day of the crime,[7] it is clear Lucas was not prejudiced *388 by this failure during his 1987 resentencing.
The record on appeal shows that at the time of Lucas's resentencing in 1987, Lucas and his counsel had clearly determined that Lucas had taken PCP on the day of the crime. Evidence showing that Lucas had ingested PCP was presented to the jury. Further, Lucas's counsel during his 1987 resentencing, Robert Jacobs, testified during the 3.850 evidentiary hearing that he tried to show the effects of PCP for mitigation purposes. The record supports this; during the resentencing, evidence regarding the effects of PCP was presented. Clearly, the fact that Lucas's 1977 trial counsel did not determine conclusively that Lucas had taken PCP on the day of the crime had no effect on the presentation of drug evidence during his 1987 resentencing.
Also, it must be noted that Lucas's 1977 trial counsel testified during the evidentiary hearing that he did not present an intoxication defense; rather he attempted to demonstrate that Lucas could not have formed the necessary premeditation as a result of his alcohol and drug use on the day of the crime. He explained that he did not think it was necessary to determine exactly what drug Lucas had taken, because it was clear he had consumed an excessive quantity of alcohol and had smoked several marijuana cigarettes. The record shows that he presented evidence of Lucas's alcohol consumption and marijuana use that day. It is clear that Lucas's 1977 trial counsel provided reasonably competent performance in his defense of Lucas, and thus the first prong of the Strickland test is also not satisfied. Further, because Lucas suffered no prejudice as a result of the performance of his 1977 trial counsel, the second prong of Strickland is likewise not satisfied. Lucas's second claim is therefore without merit.
In his third claim, Lucas argues that the trial court erred in denying him an evidentiary hearing on the issue of whether he has suffered cruel and unusual punishment as a result of the length of time he has been incarcerated on death row. This Court has repeatedly stated the standard of review for summary denial of a rule 3.850 claim:
To uphold the trial court's summary denial of claims raised in a 3.850 motion, the claims must be either facially invalid or conclusively refuted by the record. Further, where no evidentiary hearing is held below, we must accept the defendant's factual allegations to the extent they are not refuted by the record.
Peede v. State, 748 So.2d 253, 257 (Fla. 1999) (citation omitted); see also Lawrence v. State, 831 So.2d 121 (Fla.2002); Foster v. State, 810 So.2d 910, 914 (Fla.2002), cert. denied, ___ U.S. ___, 123 S.Ct. 470, 154 L.Ed.2d 359 (2002).
*389 Because Lucas's claim is facially invalid, the trial court did not err in refusing to grant Lucas an evidentiary hearing on the claim that his length of stay on death row has resulted in cruel and unusual punishment. This Court has held on numerous occasions that this claim is meritless. See Knight v. State, 746 So.2d 423, 437 (Fla.1998) (holding more than two decades on death row does not constitute cruel and unusual punishment); Rose v. State, 787 So.2d 786, 805 (Fla.2001) (holding cruel and unusual punishment claim of death row inmate, under death sentence since 1977, was without merit). As recently as February of 2002, this Court ruled that an inmate who had been on death row for over twenty-three years was not entitled to an evidentiary hearing on this precise claim because "[this Court has] previously held an extended stay on death row does not constitute cruel and unusual punishment." Foster, 810 So.2d at 916.[8]
Harold Lucas was originally sentenced to death in 1977; however, his death sentence did not become final until after his fifth direct appeal in 1992. At the time he filed his postconviction motion, he had been on death row for twenty-two years, and has now been on death row for over twenty-five years. Despite his length of stay, under this Court's clear precedent, the trial court did not err in refusing to grant him an evidentiary hearing on his claim of cruel and unusual punishment. See Foster, 810 So.2d at 916. The trial court clearly stated in its order that Lucas had presented no legal authority to support his claim, and in fact, the law in Florida entirely refutes the claim. This Court has held such a claim, even in the case of an inmate who has been on death row for more than two decades, is without merit.
In the twenty-five years since he was first found guilty of the murder of Jill Piper, Lucas has exercised his constitutional rights in challenging both the finding of guilt and his death sentence. The finding of guilt was upheld in his first direct appeal in 1979 and was not challenged in any of the subsequent appeals. Lucas is clearly guilty of the murder of Jill Piper, and it has been determined that the proper sentence is death. Lucas's exercise of his constitutional rights has prevented his sentence from being carried out. Lucas may not now claim that his punishment has been cruel and unusual as a result of his own actions in challenging his death sentence. Lucas's claim that he was entitled to an evidentiary hearing on this issue is without merit and is denied.

PETITION FOR WRIT OF HABEAS CORPUS
Lucas argues that in light of United States Supreme Court's recent decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Florida's death penalty statute violates the United States Constitution in numerous ways. This Court addressed a similar contention in Bottoson v. Moore, 833 So.2d 693 (Fla. 2002), and King v. Moore, 831 So.2d 143 (Fla.2002), and denied relief. We find that Lucas is likewise not entitled to relief on this claim.

CONCLUSION
In summary, we affirm the trial court's denial of Lucas's motion for postconviction *390 relief, and further deny Lucas's petition for a writ of habeas corpus.
It is so ordered.
ANSTEAD, C.J., and WELLS, LEWIS, and CANTERO, JJ., concur.
PARIENTE, J., and SHAW, Senior Justice, concur in result only.
QUINCE, J., recused.
NOTES
[1] See Lucas v. State, 568 So.2d 18 (Fla. 1990) ("Lucas IV "); Lucas v. State, 490 So.2d 943 (Fla.1986) ("Lucas III"); Lucas v. State, 417 So.2d 250 (Fla.1982) ("Lucas II "); Lucas v. State, 376 So.2d 1149 (Fla.1979) ("Lucas I ").
[2] Both Terri Rice and Ricky Byrd survived being shot by Lucas. Lucas was found guilty of two counts of attempted first-degree murder for these shootings. Lucas was sentenced to thirty years imprisonment for each of these convictions, with all of his sentences to run consecutively.
[3] In a lengthy footnote, this Court described the facts relied upon by the trial court to support the finding of HAC. See Lucas V, 613 So.2d at 411 n. 5. Of note to the current postconviction appeal, the trial court in Lucas V found the victim had been severely beaten by Lucas, but the court made no mention of Lucas having dragged the victim either into or out of the victim's home. See id.
[4] Huff v. State, 622 So.2d 982 (Fla. 1993).
[5] The trial court held an evidentiary hearing as to Lucas's claim of ineffective assistance of trial counsel during his guilt phase in 1977, and his claim of ineffective assistance of counsel during his fourth penalty phase held in 1987, which became the subject of the direct appeals in Lucas IV and Lucas V.
[6] Of the five claims decided without an evidentiary hearing, Lucas appeals only one, the trial court's denial of an evidentiary hearing to determine whether Lucas has suffered cruel and unusual punishment as a result of the length of time he has been incarcerated on death row.
[7] It should be noted that Lucas's 1977 trial counsel did not determine conclusively whether Lucas had ingested PCP or THC. During counsel's investigation, he interviewed numerous people, including associates of Lucas and Lucas himself. No one, including Lucas, could say with any certainty the particular drug Lucas consumed that day. Lucas, on different occasions, told his counsel, counsel's investigator, and the court-appointed mental health expert that he had taken THC. On another occasion, he informed his counsel's investigator that he had taken PCP. Defense counsel's investigator interviewed an associate of Lucas who had taken drugs with Lucas on the day of the crime. The witness informed the investigator that they had taken THC. However, during the evidentiary hearing on Lucas's 3.850 motion, Lucas presented expert testimony showing that it was common knowledge in the 1970s that THC was another term for PCP. Further, because Lucas consistently claimed to have taken a powdered drug, Lucas could not have ingested THC because THC is an oil, and therefore Lucas must have taken PCP. The expert testified that in 1976, technology was available, and Lucas's counsel could have determined, what drug Lucas consumed.
[8] Although recognizing a denial of certiorari does not constitute a ruling on the merits, we noted that the United States Supreme Court recently denied certiorari in Foster's case, refusing to consider the precise issue presented here, namely whether an extended stay on death row constitutes cruel and unusual punishment. See Foster v. Florida, ___ U.S.___, 123 S.Ct. 470, 154 L.Ed.2d 359 (2002).