[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF
APPEALS
ELEVENTH CIRCUIT
JUNE 8, 2012
JOHN LEY

————————————

No. 08-15761

————————————

D. C. Docket No. 04-00222-CV-JES-DNF

HAROLD GENE LUCAS,

Petitioner-Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————

(June 8, 2012)

Before EDMONDSON, MARCUS and PRYOR, Circuit Judges.

MARCUS, Circuit Judge:

In this old capital case, Harold Gene Lucas was convicted on one count of first-degree murder for the 1976 death of sixteen-year-old Anthia "Jill" Piper and two counts of attempted first-degree murder for the shootings of Terri L. Rice and Richard "Ricky" Byrd, Jr. He was sentenced by a state trial court in Florida to die for Piper's murder. After several remands from direct appeals and a resentencing proceeding before a new jury that again resulted in the imposition of the death penalty, the Florida Supreme Court affirmed Lucas's convictions and sentences on direct appeal and then on collateral review.

Thereafter, a federal district court denied Lucas's petition for a writ of habeas corpus, which included claims that: (1) the state trial court's admission of testimony of an undisclosed rebuttal witness was unconstitutional; (2) Lucas's trial counsel rendered ineffective assistance; and (3) the State's use of peremptory challenges to exclude all jurors who expressed reservations about the death penalty was unconstitutional. After thorough review, we conclude that Lucas is not entitled to relief on any of these claims. Accordingly, we affirm the district court's judgment and deny the petition.

**I.**

**A.     The Crimes and Lucas's Trial**

On August 30, 1976, Lucas was indicted and charged with the first-degree murder of Jill Piper, along with two counts of attempted first-degree murder for the shootings of Rice and Byrd. The trial began on January 11, 1977. For our purposes, the essential facts adduced at trial are these.

The 16-year-old murder victim, Piper, was romantically involved with Lucas, age 25 at the time of the crime, but their relationship was a troubled one. One week before the murder, the police had responded to a dispute between them at the Piper residence. A few days later, Lucas threatened Piper, and on August 12, 1976, a friend, Terri Rice stayed the night with Piper because Piper was afraid to be alone.

The next day, Lucas and Piper saw each other first at a gas station and then at a park. At the gas station, Lucas made threats about Piper, telling one witness that "he was going to kill her," and telling Piper herself that "she was a dead bitch." Later, at the park, he told another witness that Piper "was coming down, [meaning] he was going to kill her," and told yet another that "he was going to put that little bitch in a hole." After making these threats, Lucas returned home and consumed alcohol and drugs with his friends. Later that night, Lucas arrived at Piper's house, this time carrying a rifle. Anticipating Lucas's visit, Piper and her friends, Terri Rice and Ricky Byrd, had armed themselves.

3

According to Rice, she, Byrd and Piper were approaching Piper's home when Harold Lucas stepped out from behind the side of the house and raised a rifle at Piper. Rice testified that as Byrd entered the home, Lucas came around the house and shot Piper; Piper fell to the ground. Rice and Byrd explained that they then ran into the bedroom to call the police. Rice testified that she heard Piper inside the house, crying, screaming, and asking Lucas why he had done this. Byrd recounted that he too had heard slapping and screaming coming from the front of the house, and was aware of fighting and begging noises while he and Rice were calling the police. Rice and Byrd said that Lucas then came into the bedroom, shot Byrd, and followed Rice into the bathroom. Rice begged him to leave them alone; Lucas said he would and turned to go, but he then shot Rice through the door. Byrd remembered Lucas returning and putting a gun to his face. Byrd wasn't sure if he heard a click, but nothing happened. Lucas kicked Byrd and left the room. Byrd testified that he called for Rice and they got back on the phone. Byrd could hear noises in the house, as if someone were rummaging through drawers, looking for something. Finally he heard an officer yelling for anyone to come out of the house; Byrd made it out to the front yard.

Piper's body, riddled with seven gunshot wounds in her head, shoulder, back, and leg, was found outside the house. After the shooting, Lucas hid in the

4

woods for several days before he was found and arrested by the police on August 21, 1976.

Lucas's defense at trial was that he had been intoxicated from drugs and alcohol at the time of the crime and, as a result, was incapable of forming the premeditation required by statute. Defense counsel presented testimony that before the murder, Lucas had consumed twelve large beers, ten to twenty marijuana cigarettes, and five dollars' worth of a white powder drug he believed to be Tetrahydrocannabinol ("THC"). Lucas himself testified that he had been high at the time of the murder; had no memory of having a gun, going to Piper's house, or shooting anyone; and had woken up in the woods the next morning.

In rebuttal, a State forensic expert opined that THC did not come in a powder, but in oil, and noted on cross-examination that Phencyclidine ("PCP") could easily be reduced to powder form. Additionally, the State presented testimony that at about 8:30 p.m. on the night of the murder, Lucas was driving with friends when his car was stopped by Deputy Glenn Boyette of the Lee County Sheriff's Department. Deputy Boyette testified that during the stop, Lucas was rational, was able to stand up well, understood the questions he was asked, made no disturbance, did not have a "crazy look" in his eyes, and was not arrested.

Deputy Boyette's name, however, had not been disclosed on the State's witness list.[1]

Lucas was convicted as charged on all counts. Following the penalty phase, all twelve members of the jury recommended that the court impose the death sentence on Lucas for the murder of Jill Piper.[2] On February 9, 1977, the trial judge sentenced Lucas to death for Piper's murder and to thirty years' imprisonment for each of the two counts of attempted first-degree murder, to be served consecutively.

## B. Lucas's Direct Appeals and Remands

Lucas appealed both his convictions and sentences to the Florida Supreme Court. Over a period of many years, Lucas's case shuttled back and forth between the Florida Supreme Court and the trial court four times -- the Florida Supreme Court repeatedly vacated Lucas's death sentence and remanded to the trial court for

---

[1] Before trial, the State had responded to a request by Lucas for potential witnesses with a list of 53 people; Boyette's name was not included. At trial, defense counsel began to object to the admission of Deputy Boyette's testimony but was cut off by the trial judge:

> MR. TAYLOR: Your Honor, what I am looking for is my witness list provided to me by the State in this matter. To my knowledge - -.
>
> THE COURT: Rebuttal witness does not have to be furnished.
>
> MR. TAYLOR: Very well, your honor.

The trial attorney said nothing more.

[2] However, a resentencing hearing before a new jury was later conducted in 1987.

resentencing, and the trial court repeatedly reimposed the death penalty. <u>Lucas v. State</u>, 568 So. 2d 18 (Fla. 1990); <u>Lucas v. State</u>, 490 So. 2d 943 (Fla. 1986); <u>Lucas v. State</u>, 417 So. 2d 250 (Fla. 1982); <u>Lucas v. State</u>, 376 So. 2d 1149 (Fla. 1979).

Relevant for our purposes, on direct appeal the Florida Supreme Court rejected Lucas's claim that the trial court violated Florida Rule of Criminal Procedure 3.220 by allowing Deputy Boyette to testify as an undisclosed rebuttal witness. <u>Lucas</u>, 376 So. 2d at 1151-52. The Florida Supreme Court found that the trial judge had erred in allowing this testimony without inquiring into the State's non-compliance with the discovery rule, but that defense counsel had not objected. In this situation, it concluded, the "trial judge was not required to make further inquiry." <u>Id.</u>

Also relevant today is the penalty phase that took place after the Florida Supreme Court remanded the case for a new sentencing proceeding before a newly empaneled jury. <u>Lucas</u>, 490 So. 2d at 945. This 1987 proceeding is the operative sentencing hearing for purposes of this appeal. During voir dire examination, the trial court asked each member of the venire panel if he or she was opposed to the death penalty. After further questioning by the prosecutor, the State peremptorily excused three potential jurors who expressed reservations about the death penalty.

Lucas's new counsel, Assistant Public Defender Robert Jacobs, objected to the peremptory challenges, but was overruled by the trial court.[3]

At the new sentencing proceeding, the State presented much of the same evidence that it had offered initially. This included testimony from the living victims, Terri Rice and Ricky Byrd; the deputies, officers, investigator, and medical examiner who had investigated the crime, as well as Deputy Boyette; two individuals who had seen Lucas before the murder, and had either been threatened by him or fought with him; and Piper's mother.

This time the defense presented substantial mitigating evidence. Several character witnesses (including Lucas's brother, brother-in-law, sister, sister-in-law, and a friend) testified, relaying Lucas's remorse for the murder, his improved disposition, and his trustworthiness. The witnesses also revealed that Lucas had acted "very high" at the time of the crime or shortly thereafter, and that Lucas had taken PCP the same day. Lucas testified as well, confirming that PCP was the drug he had taken. In addition, Lucas's medical expert, psychiatrist Daniel Sprehe, MD, opined about the effects on Lucas of the large amount of alcohol and drugs, mainly PCP, that he had consumed before the crime.

---

[3] In a subsequent direct appeal of his sentence, the Florida Supreme Court rejected the defendant's argument based on the prosecutor's use of peremptory challenges. Lucas, 568 So. 2d at 20 n.2.

At the end of the resentencing hearing, the jury again recommended that the court impose the death sentence, this time by a vote of 11 to 1. On May 7, 1987, the trial judge again sentenced Lucas to death.

During a subsequent remand from another direct appeal to the Florida Supreme Court, the trial judge entered a new written order sentencing Lucas to death -- the operative sentencing order for purposes of this appeal. This time, the trial court found that the State had "proven beyond every reasonable doubt" two aggravating factors: that (1) Lucas was previously convicted of a felony involving the use or threat of violence to the person (the attempted murders), Fla. Stat. § 921.141(5)(b); and (2) the first-degree murder of Piper was especially heinous, atrocious and cruel ("HAC"), Fla. Stat. § 921.141(5)(h). Lucas also identified fifteen statutory and non-statutory mitigating factors to be considered upon resentencing. The trial court afforded little to no weight to most of these factors, and in the end, the trial court concluded that the aggravating factors "greatly" outweighed the mitigating ones.

On December 24, 1992, the Florida Supreme Court rejected Lucas's final direct appeal and affirmed the trial court's death sentence. Lucas v. State, 613 So. 2d 408, 411 (Fla. 1992). Thereafter, the United States Supreme Court denied Lucas's petition for a writ of certiorari. Lucas v. Florida, 510 U.S. 845 (1993).

9

**C. State Post-Conviction Proceedings**

Lucas began his collateral attack on the convictions and sentence on October 3, 1994, filing a motion to vacate under Florida Rule of Criminal Procedure 3.850, and then an amended motion on January 19, 1999. The amended motion alleged seven grounds for relief, including ineffective assistance of counsel. Following a three-day evidentiary hearing, the trial judge denied Lucas's Rule 3.850 motion. Lucas appealed, raising two grounds for relief, and concurrently sought a writ of habeas corpus from the Florida Supreme Court, arguing that the Florida death penalty law as applied was unconstitutional under federal and state law. The Florida Supreme Court affirmed the trial court's denial of the Rule 3.850 motion and denied the petition for a writ of habeas corpus. Lucas v. State, 841 So. 2d 380, 389-90 (Fla. 2003).

Relevant here, the Florida Supreme Court rejected Lucas's claim that counsel was ineffective during the 1987 resentencing proceeding for failing to rebut the HAC aggravator with evidence that Piper was neither beaten nor dragged at the time of the shooting. The court began by recounting the resentencing court's factual findings that supported the application of the heinous, atrocious and cruel aggravator. This "included evidence that Piper was shot numerous times in the back and the head, was pursued into her home, and suffered defensive wounds."

Id. at 386.  The court determined that Lucas had not provided "any conclusive, uncontroverted evidence that could have been presented in 1987 to dispel the findings of fact relied upon by the 1987 sentencing court," and by the Florida Supreme Court, to support the HAC aggravator.  Id.  The court also rejected Lucas's claim that his 1977 trial counsel was ineffective by failing to establish that Lucas had consumed PCP rather than THC before the murder.  The Florida Supreme Court concluded that Lucas did not suffer any prejudice, since at the time of his 1987 resentencing, Lucas's counsel had clearly learned that Lucas had taken PCP before the crime and had presented this evidence to the resentencing jury.  Id. at 387-88.

**D.    Lucas's Federal Habeas Petition**

Lucas then moved his attack into federal court, commencing his federal habeas proceedings, pursuant to 28 U.S.C. § 2254, in the United States District Court for the Middle District of Florida.  He raised twenty separate claims in his petition, which the district court properly considered through the lens of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  The district court ultimately rejected all of them, only five of which are relevant for our purposes -- Claims 1, 2, 5, 6 (subissue 2), and 17.  As for Claim 1, Lucas argued that the state trial court had erred by admitting the testimony of Deputy Boyette,

11

the State's undisclosed rebuttal witness, without first conducting an inquiry into the State's non-compliance with Florida Rule of Criminal Procedure 3.220. The district court concluded that Lucas had not exhausted this claim in state court because he had not fairly presented the claim as one based on federal law (a Sixth Amendment confrontation claim), rather than on state law. In the alternative, the district court denied relief on the merits, holding that the Florida Supreme Court's rejection of the claim was not contrary to or an unreasonable application of Supreme Court law.

As for Claim 2 -- alleging that trial counsel had been ineffective in failing to inform the trial judge of controlling Florida case authority requiring a hearing about the non-disclosure of Deputy Boyette's name -- the district court also concluded that Lucas had not exhausted his claim in state court, because he had failed to present the issue to the Florida Supreme Court on direct appeal or during collateral proceedings.

As for Claim 5 -- alleging that his 1977 trial counsel was ineffective for failing to identify the drug Lucas had consumed before the murder, which purportedly prejudiced his ability to present evidence at the 1987 resentencing proceeding -- the district court pointed out that the Florida Supreme Court rejected the claim because it found that Lucas had failed to establish prejudice under

12

Strickland v. Washington, 466 U.S. 668 (1984). The district court determined that the state court record fully supported the state court's factual findings that counsel at the resentencing hearing had determined that the drug taken was PCP and had presented evidence to the jury about the effects of PCP for mitigation purposes. The district court thus concluded that the Florida Supreme Court's rejection of Lucas's claim was not contrary to or an unreasonable application of Strickland.

As for Claim 6 (subissue 2), Lucas alleged that his trial counsel had been ineffective for failing to negate the HAC aggravator with evidence that the victim, Jill Piper, could not have been beaten by the defendant in her house. The district court recited that during the Rule 3.850 evidentiary hearing, Lucas had called two experts to show that the victim had not been beaten during the crime, but the testimony of each of them included facts that supported a contrary view. The district court found that because the new evidence presented was inconclusive, the Florida Supreme Court's ruling that the evidence would not have affected the trial court's decision on the HAC aggravator was not contrary to or an unreasonable application of Strickland.

Finally, the district court rejected Claim 17 -- that the State violated Lucas's federal constitutional rights by using peremptory challenges to exclude all potential jurors who expressed reservations about the death penalty. The district court

13

determined that the Florida Supreme Court's rejection of the claim was not contrary to or an unreasonable application of U.S. Supreme Court law. It reasoned that while peremptory challenges are part of our common-law heritage, they "are not of federal constitutional dimension."

Following the district court's denial of Lucas's petition, Lucas sought a certificate of appealability ("COA") on all twenty claims. The district court granted a COA on the five grounds we've just detailed. Lucas moved this Court to expand the COA to include all of his remaining claims except one. We denied this application, Lucas v. Sec'y, Dep't of Corr., No. 08-15761 (11th Cir. July 1, 2010), whereupon he timely appealed the district court's adverse judgment on Claims 1, 2, 5, 6 (subissue 2), and 17.

## II.

Since Lucas filed his federal habeas petition after April 24, 1996, it is governed by 28 U.S.C. § 2254, as amended by AEDPA. Wilcox v. Fla. Dep't of Corr., 158 F.3d 1209, 1210 (11th Cir. 1998). Thus, a federal court may grant habeas relief only if the state court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or was (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court

14

proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established law if the court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court confronted facts that are "materially indistinguishable" from relevant Supreme Court precedent but arrived at a different result. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision is an "unreasonable application" of clearly established law if the state court unreasonably extends or fails to extend a clearly established legal principle to a new context. Jennings v. McDonough, 490 F.3d 1230, 1236 (11th Cir. 2007). A state court's factual findings are presumed correct unless rebutted by the petitioner with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Finally, we review de novo a district court's ruling on a procedural bar question. Kelley v. Sec'y for Dep't of Corr., 377 F.3d 1317, 1345 (11th Cir. 2004).

## III.

### A.    The Trial Court's Admission of an Undisclosed Rebuttal Witness

First, Lucas alleges that the state trial court erred when it admitted at trial the testimony of an undisclosed rebuttal witness (Deputy Boyette) without first conducting an inquiry into the State's non-compliance with the operative discovery rule, Florida Rule of Criminal Procedure 3.220. We conclude, however, that Lucas failed to exhaust this claim in state court.

15

Before seeking § 2254 habeas relief in federal court, a petitioner must exhaust all state court remedies available for challenging his conviction. See 28 U.S.C. § 2254(b), (c). For a federal claim to be exhausted, the petitioner must have "fairly presented [it] to the state courts." McNair v. Campbell, 416 F.3d 1291, 1302 (11th Cir. 2005). The Supreme Court has suggested that a litigant could do so by including in his claim before the state appellate court "the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" Baldwin v. Reese, 541 U.S. 27, 32 (2004). The Court's guidance in Baldwin "must be applied with common sense and in light of the purpose underlying the exhaustion requirement" -- namely, giving the state courts "a meaningful opportunity" to address the federal claim. McNair, 416 F.3d at 1302. Thus, a petitioner could not satisfy the exhaustion requirement merely by presenting the state court with "all the facts necessary to support the claim," or by making a "somewhat similar state-law claim." Kelley, 377 F.3d at 1343-44. Rather, he must make his claims in a manner that provides the state courts with "the opportunity to apply controlling legal principles to the facts bearing upon (his) [federal] constitutional claim." Id. at 1344 (quotation omitted).

To "fairly present" a claim, the petitioner is not required to cite "book and verse on the federal constitution." Picard v. Connor, 404 U.S. 270, 278 (1971)

16

(quotation omitted).  Nevertheless, a petitioner does not "fairly present" a claim to the state court "if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  Baldwin, 541 U.S. at 32.  In other words, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues."  Jimenez v. Fla. Dep't of Corr., 481 F.3d 1337, 1342 (11th Cir. 2007) (quoting Snowden v. Singletary, 135 F.3d 732, 735 (11th Cir. 1998)) (concluding that the petitioner's claims were raised where the petitioner had provided enough information about the claims (and citations to Supreme Court cases) to notify the state court that the challenges were being made on both state and federal grounds).

Here, the Florida Supreme Court did not specifically address Lucas's first claim in federal constitutional terms, see Lucas, 376 So. 2d at 1151-52, but this "does not mean the claim was not presented to it," Dye v. Hofbauer, 546 U.S. 1, 3 (2005).  Instead, we must look to Lucas's state court briefs to determine whether he mentioned "the federal source of law on which he relies or a case deciding such a claim on federal grounds, or . . . label[ed] the claim 'federal.'"  Baldwin, 541 U.S. at 32.  Point I of Lucas's brief in his first direct appeal to the Florida Supreme Court argued that allowing the rebuttal witness to testify without complying with

17

Florida Rule of Criminal Procedure 3.220 deprived Lucas "of his constitutional right of confrontation of witnesses against him." The difficulty is that in addition to the Sixth Amendment right of confrontation guaranteed by the U.S. Constitution, the Florida Constitution also guarantees a right of confrontation. Fla. Const. art. I, § 16(a); Conner v. State, 748 So. 2d 950, 954 (Fla. 1999).

Indeed, to the extent Lucas relies on his state petition's reference to a "constitutional right of confrontation of witnesses," to argue that he raised a federal claim before the state courts, the Supreme Court in Baldwin flatly rejected an analogous argument. There, Baldwin had argued that his petition fairly presented a federal ineffective assistance of counsel claim because "ineffective" was a term of art in Oregon that referred only to federal law claims. Baldwin, 541 U.S. at 32. The Supreme Court disagreed, reasoning that the petitioner had failed to demonstrate that Oregon state law used "ineffective assistance" to refer only to federal law claims rather than a similar state law claim. Id. Here, Lucas does not even attempt to argue that the phrase "constitutional right of confrontation of witnesses" is peculiar to federal law. Simply referring to a "constitutional right of confrontation of witnesses" is not a sufficient reference to a federal claim, any more than a reference to "ineffective assistance of . . . counsel" was sufficient in Baldwin, 541 U.S. at 32-33. Moreover, none of the cases cited in Lucas's state

18

briefs discussed the right to confront witnesses, under either the state or federal constitutions, and Lucas's briefs also failed to cite to any constitutional provision. Thus, Lucas cannot be said to have fairly apprised the state court of his federal constitutional right-to-confrontation claim.

In short, Lucas did not exhaust this claim in state court. A petitioner who fails to exhaust his claim is procedurally barred from pursuing that claim on habeas review in federal court unless he shows either cause for and actual prejudice from the default or a fundamental miscarriage of justice from applying the default. See Bailey v. Nagle, 172 F.3d 1299, 1306 (11th Cir. 1999) (per curiam). Since Lucas has made no showing of either (and indeed, he has not even attempted to do so), his claim is procedurally barred.

But even if we were to consider the claim on the merits, it would fail because Lucas has not identified any clearly established United States Supreme Court law setting forth a constitutional right to the disclosure of the prosecution's rebuttal witnesses. Neither of the cases he cites, Davis v. Alaska, 415 U.S. 308 (1974), or Wardius v. Oregon, 412 U.S. 470 (1973), address the pretrial disclosure of potential rebuttal witnesses by the State. Not only is the Supreme Court case law not on point, but if anything, our case law establishes that "[r]ebuttal witnesses

are a recognized exception to all witness disclosure requirements." <u>United States</u> <u>v. Windham</u>, 489 F.2d 1389, 1392 (5th Cir. 1974).[4]

## B. Trial Counsel's Failure to Cite Controlling Authority Regarding Discovery of Rebuttal Witnesses

As for the second claim, Lucas argues that his trial counsel was ineffective in failing to inform the state trial judge of controlling state case law authority mandating an inquiry into the State's non-compliance with the discovery rule. Lucas failed to exhaust this claim as well.

Again, the Supreme Court has instructed us that exhaustion is satisfied if the habeas petitioner "fairly presented" to the state courts the "substance" of his federal habeas claim. <u>Anderson v. Harless</u>, 459 U.S. 4, 6 (1982). We have held that "courts should exercise flexibility in determining whether defendants have met this requirement." <u>Cummings v. Dugger</u>, 862 F.2d 1504, 1507 (11th Cir. 1989). However, when considering a claim of ineffective counsel, we have said:

> [A] general allegation of ineffective assistance or a specific allegation of ineffective assistance wholly unrelated to the ground on which the claim ultimately depends will [not] immunize a petitioner from a finding of procedural default.

<u>Ogle v. Johnson</u>, 488 F.3d 1364, 1369 (11th Cir. 2007) (quotation omitted).

---

[4] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit issued before October 1, 1981.

Lucas's first claim for relief, as we have already described it, is related to this one. There, he claimed that the trial court erred in denying him his right to confrontation by misunderstanding and failing to follow Florida law regarding the discovery of rebuttal witnesses, whereas here, he claims that his trial counsel rendered ineffective assistance by failing to properly instruct the trial court about Florida law on discovery of rebuttal witnesses. On direct appeal, Lucas made the argument only in the context of the trial court's error, not ineffective assistance of counsel. In fact, he even argued to the Florida Supreme Court that trial counsel had not corrected the trial court's misunderstanding of the law on rebuttal witnesses "since by his ruling the trial judge had announced that such a course would be fruitless," citing Bailey v. State, 224 So. 2d 296 (Fla. 1969). The Florida Supreme Court rejected Lucas's claim of trial court error, concluding that because trial counsel had failed to apprise the trial court of the correct law, "the trial judge was not required to make further inquiry." Lucas, 376 So. 2d at 1151-52. Notably, that opinion did not address any related claim of ineffective assistance of counsel because none was ever raised. Again, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts." Anderson, 459 U.S. at 6. Nowhere did Lucas complain on direct appeal to the Florida

21

Supreme Court that he was denied effective counsel because his trial counsel failed to cite controlling precedent to the trial court.

In state post-conviction proceedings, Lucas did actually argue to the trial court that counsel had been ineffective for failing to correct the trial court's misunderstanding of the law of discovery. The trial court denied this claim, but Lucas never appealed the denial to the Florida Supreme Court. Rather, he specified in his petition that he was appealing two "basic claims of ineffective assistance of counsel": (1) his "trial attorney was ineffective in failing to determine what drugs Mr. Lucas was under and the [e]ffects of those drugs," and (2) "the trial attorney should have shown that there could not have been a beating inside the house, and in that respect, negate the aggravators."

We repeat that a prisoner who fails to present his claim in a petition for discretionary review to a state court of last resort has not properly presented that claim to the state courts. O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999). Here, Lucas raised during post-conviction proceedings in the Florida Supreme Court two ineffective assistance claims; they were wholly unrelated to the rebuttal witness issue. The arguments he made were plainly insufficient to exhaust his rebuttal-witness ineffective-assistance-of-counsel claim, see Ogle, 488 F.3d at 1369, so it's procedurally barred. Moreover, Lucas has not presented us with any argument

about cause and prejudice or a miscarriage of justice to overcome the procedural bar.

## C. Trial Counsel's Failure to Investigate and Present Expert Testimony Regarding Lucas's Use of PCP

To succeed on a claim of ineffective assistance, a petitioner must show both deficient performance and prejudice: (1) that "counsel's representation fell below an objective standard of reasonableness," and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694. Lucas contends that he was denied effective assistance of counsel because his 1977 trial counsel failed to investigate exactly which illegal drug Lucas had ingested prior to the murder. Lucas claims that he was prejudiced by his trial counsel's failure because this failure somehow limited the evidence available for his 1987 resentencing proceeding, resulting in the sentencing court affording only slight weight to the mitigating factor of his drug use at the time of the crime.

Because a petitioner's failure to show either deficient performance or prejudice is fatal to a Strickland claim, we need not address both Strickland prongs if the petitioner fails to satisfy either of them. See Windom v. Sec'y, Dep't of Corr., 578 F.3d 1227, 1248 (11th Cir. 2009) (quoting Strickland, 466 U.S. at 697). The Florida Supreme Court denied relief on the ground that "Lucas did not suffer

23

any prejudice in his 1987 resentencing, and in fact evidence regarding his use of drugs was introduced." Lucas, 841 So. 2d at 387. Lucas has not shown that the Florida Supreme Court's failure to find Strickland prejudice was contrary to or an unreasonable application of Strickland.

It is true that at Lucas's original trial, witnesses, including Lucas himself, testified that the defendant had consumed THC, instead of PCP, on the day and evening of the murder, and that there was some question about whether he had taken PCP instead. In particular, the State's forensic chemist suggested that Lucas actually may have taken PCP instead of THC, testifying that THC is in the form of oil, not powder, and that PCP was a pain killer that came in tablet form which could easily be reduced to powder. But regardless of which drug Lucas may have consumed that day and evening, several witnesses gave detailed trial testimony concerning the effect the cocktail of drugs and alcohol had had on Lucas. They testified that Lucas was "high as a kite" that night; putting his boots on, taking them off, and putting them back on; and "too stoned to do anything." Indeed, as trial counsel Taylor acknowledged at a later post-conviction evidentiary hearing, while there was some confusion as to whether Lucas had purchased THC or PCP, he "didn't concentrate that much on the more exoteric [sic] type drugs [at the time]." He explained that he felt that most people would be familiar with the

24

effects of the alcohol and marijuana described, and he had the benefit of testimony from several witnesses about how the drugs were affecting Lucas prior to the shootings.

By the time of Lucas's 1987 resentencing, however, the defense fully recognized that Lucas had actually consumed PCP instead of THC, and at the new proceeding presented evidence to that effect to the judge and jury, along with testimony about the effects of PCP. Specifically, Georgina Martin, a friend of Lucas's, testified that the defendant came to her house on the day of the murder to buy "PCP, angel dust, THC, whatever it was called." Another friend, Dan Dowdal, who had been with Lucas on the day of the murder, testified that he, Lucas and a few others had taken PCP that day. In fact, Lucas himself testified that the drug he had purchased that day was PCP, and he recalled the name of the woman who had sold him the drug.

Consistent with this testimony, Lucas's expert, Dr. Sprehe, agreed that Lucas had ingested a large amount of alcohol and drugs, mainly PCP, on the day of the shootings. Dr. Sprehe described the effects of PCP, including violent, impulsive behavior and sudden, extreme anger, and opined that Lucas was intoxicated by the combination of drugs and alcohol, and could not premeditate a murder. Sprehe found Lucas to be depressed and remorseful, and concluded that

25

Lucas had committed the murder while under the influence of an extreme mental or emotional disturbance on account of the drugs he had ingested, and that the drugs had substantially impaired Lucas's ability to conform his conduct to the requirements of the law.

After the presentation of this testimony, the trial judge issued his sentencing order expressly reflecting that Lucas's voluntary consumption of alcohol and drugs, including PCP, was considered in the sentencing calculus under two statutory and one non-statutory mitigating circumstances, Fla. Stat. § 921.141(6). Specifically, the trial judge noted that the extreme mental and emotional disturbance mitigator, id. § 921.141(6)(b), was supported by Dr. Sprehe's testimony, which was based in large part "upon a mental status examination of the defendant and the multiple drug and alcohol intoxication which included the ingestion of substantial amounts of PCP on the date of the murder." The primary basis for Sprehe's opinion, said the trial court, was the "defendant's voluntary ingestion of alcohol, marijuana, and other drugs including PCP which may have diminished his inhibitions, but did not destroy his cognitive function." The court thus afforded "very little weight" to this mitigator.

As for the capacity-to-conform mitigator, Fla. Stat. § 921.141(6)(f), the sentencing judge found that "the defendant had voluntarily ingested alcohol and

26

other drugs such as PCP which may have reduced his inhibitions and increased his impulsiveness." Again, the court rejected this mitigator, concluding that the rest of the evidence -- including the manner in which the defendant carried out his plan -- convincingly demonstrated the type of purposeful activity that completely undermined the capacity-to-conform mitigator. Finally, as for the "impaired ability to appreciate the criminality of his conduct" mitigator, the trial court again found "insufficient evidence to establish that [Lucas's ingestion of alcohol and drugs, including PCP] impaired his ability to appreciate the criminality of his conduct but rather that [it] tended to increase his impulsiveness and decrease his inhibitions with the result that he set about his nefarious scheme and carried it through in a purposeful manner."

On this ample record, the Florida Supreme Court made the following factual findings regarding Lucas's resentencing: (1) Lucas's resentencing counsel had clearly determined that Lucas had taken PCP before the murder; (2) evidence showing that Lucas had ingested PCP was presented to the resentencing jury; (3) the record supported the testimony of Lucas's resentencing counsel that he had tried to show the effects of PCP for mitigation purposes; and, thus, (4) the fact that Lucas's 1977 trial counsel did not determine conclusively that Lucas had taken PCP before the crime had no effect on the presentation of drug evidence during

27

Lucas's 1987 resentencing proceeding. Lucas has not shown any error in these findings, much less rebutted them with clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

The record is abundantly clear that even if trial counsel had identified the PCP in 1977, the petitioner has not shown how this possibly could have affected his 1987 resentencing proceeding. Lucas has shown no reasonable probability of a different outcome at the 1987 resentencing on account of trial counsel's deficient performance in 1977. In short, the Florida Supreme Court's rejection of this claim was not contrary to or an unreasonable application of Strickland.

D.     **Resentencing Counsel's Failure to Negate the HAC Aggravating Factor**

Next, Lucas claims that his resentencing counsel was ineffective for failing to negate the application of the heinous, atrocious and cruel aggravator. He relies on the lack of forensic evidence indicating that Piper had been beaten. Thus, the petitioner contends that resentencing counsel performed deficiently by failing to present testimony that the victim had not been beaten in her home, thereby undermining the HAC aggravator. As for prejudice, Lucas points to the trial judge's sentencing order suggesting that Piper had been severely beaten in order to support the HAC aggravator. The Florida Supreme Court rejected this claim on both Strickland performance and prejudice grounds. Lucas, 841 So. 2d at 386-87.

For starters, a review of the record reveals that the trial court's sentencing order reflected a variety of bases for its finding of the HAC aggravator; the trial court did not rely solely, or even primarily, on the suggestion that Piper had been beaten during the course of the murder. Among other things, the court repeatedly discussed the verbal threats Lucas had made to Piper prior to the murder, and the mental anguish and fear Piper suffered, knowing Lucas's intentions. The sentencing court also relied on the premeditated nature of the crime, where Lucas had purposefully and knowingly armed himself, attacked Piper in a way that she was unable to defend herself, shot her from the dark shadows, and overpowered her. The court emphasized the physical pain Piper suffered from the gunshot wounds, and mentioned the defensive wounds she had incurred. The trial court also emphasized that Piper pleaded for her life, to no avail. Thus, it was not unreasonable for the Florida Supreme Court to have found that "[t]he sentencing judge based his ruling on the totality of the circumstances, which included evidence that Piper was shot numerous times in the back and the head, was pursued into her home, and suffered defensive wounds." Lucas, 841 So. 2d at 386.

Not only was the resentencing judge's finding of the HAC aggravator supported by many reasons unrelated to any beating, but Lucas failed to refute the existence of a beating during post-conviction proceedings. While crime scene

29

reconstruction expert Paul Kish testified at the post-conviction hearing that he saw no evidence of a "dragging" or "beating" and opined that the murder only took place outside of Piper's house, Kish admitted that the physical evidence did not contradict Byrd's testimony that he heard the sound of slaps and Piper's screams inside the house, <u>after</u> the original gunshots. Similarly, Dr. Wallace Graves, the medical examiner who had performed Piper's autopsy, testified that he saw no physical evidence that Piper was beaten, but noted nonetheless that the victim had several defensive wounds and abrasions on her hands, fingers and arm. Based on this testimony, the Florida Supreme Court found that "[t]he medical examiner . . . testified that Piper had cuts on her hands and arms that were characteristic of defensive wounds, as if Piper was fending off an attack by a knife or some other sharp instrument," and that "a forensic consultant, testified that . . . the evidence does not contradict the State's assertion that Piper was shot several times outside the residence, was then inside the home screaming, and eventually suffered the fatal gunshot wound to the head outside her home." <u>Lucas</u>, 841 So. 2d at 386. Lucas has not rebutted these findings with clear and convincing evidence. <u>See</u> 28 U.S.C. § 2254(e)(1).

At the end of the day, the Florida Supreme Court's conclusion that "the additional evidence asserted during the post-conviction evidentiary hearing would

30

not have altered [the HAC] finding" is well supported by the record. Again, the Florida Supreme Court's application of Strickland's prejudice prong was not contrary to or an unreasonable application of clearly established Supreme Court law.

**E. The Prosecutor's Use of Peremptory Challenges To Exclude All Potential Jurors Who Expressed Reservations about the Death Penalty**

Finally, Lucas claims that he was denied his right to a trial by an impartial jury when the prosecution exercised peremptory challenges during jury selection at his 1987 resentencing proceeding to excuse three potential jurors who had expressed reservations about their ability to impose the death penalty. We recently rejected this same claim in Bowles v. Sec'y, Dep't of Corr., 608 F.3d 1313 (11th Cir.), cert. denied, 131 S. Ct. 652 (2010). Lucas, therefore, is not entitled to relief.

The U.S. Supreme Court has repeatedly held "that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Federal law is "clearly established" only when it is "embodied in a holding" of the Supreme Court. Thaler v. Haynes, 130 S. Ct. 1171, 1173 (2010) (per curiam). In Bowles, a panel of this Court concluded that there is no clearly established Supreme Court law prohibiting the State from using peremptory challenges to remove jurors with reservations

31

about the death penalty. As we explained, the Supreme Court itself has recognized that it has adopted no such bar for peremptory challenges. Bowles, 608 F.3d at 1316 (citing Lockhart v. McCree, 476 U.S. 162, 190-91 (1986) (Marshall, J., dissenting)).

In the absence of any clearly established Supreme Court law, we are compelled to conclude, as we did in Bowles, that the state court decision -- refusing to extend "Batson v. Kentucky . . . to peremptory challenges of prospective jurors based on their opinions regarding the death penalty," Lucas, 568 So.2d at 20 n.2 -- is not contrary to or an unreasonable application of clearly established Supreme Court law. Accordingly, this claim must fail as well.

**AFFIRMED.**